Jose G. ALEJANDRO

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration**

No. CIV.A.B–03–018.

United States District Court, S.D. Texas, Brownsville Division.

Sept. 11, 2003.

John R. Heard, Attorney at Law, San Antonio, TX, for Plaintiff.

Julia Baird Denegre, Dallas, TX, for Defendant.

## *JUDGMENT*

HANEN, District Judge.

Plaintiff appeals from a denial of Supplemental Security Income ("SSI") benefits and disability insurance.[1] Pending before the Court are Cross–Motions for Summary Judgment. Both parties conceded in the May 9, 2003 hearing held telephonically that the case was ripe and the issues in dispute could be resolved by ruling on these motions. For the reason stated below, the Court hereby **DENIES** the Plaintiff's Motion for Summary Judgement and **GRANTS** the Defendant's Motion for Summary Judgment.

### A. *Background*

Plaintiff is a thirty-nine (39) year-old individual whose case is premised upon three main impairment claims: (1) Hepatitis C; (2) an organic brain syndrome that causes seizures; and (3) a personality disorder accompanied by depression. He

---

**1.** Actually, there is some confusion about the benefit denials that are under appeal. Plaintiff's complaint lists both SSI and disability insurance benefits as being at issue. *Docket No. 1* at ¶ 3. The Administrative Law Judge's opinion only references the regulatory provisions that pertain to the former type of benefits. *Record* at 9–19. The Plaintiff's Motion for Summary Judgment, almost exclusively refers to the regulations that govern the latter type of benefits. *Docket No. 29.* Whereas, the Defendant's Brief in Support of her Motion for Summary Judgment references both sets of regulatory provisions. *Docket No. 31.* Both Plaintiff and Defendant, however, indicate in their procedural summaries that SSI benefits are the subject of the present appeal. *Docket Nos. 29, 31.*

Disability insurance and SSI benefits are governed by Title II, 42 U.S.C. § 401 *et seq.,* and Title XVI, 42 U.S.C. § 1381 *et seq.,* of the Social Security Act respectively. In addition, numerous regulatory provisions govern dis-

ability insurance and SSI benefits. *See* 20 C.F.R. § 404.1 *et seq.* (disability insurance); 20 C.F.R. § 416.101 *et seq.* (SSI). Although technically governed by different statutes and regulations, disability insurance and SSI benefits are subject to identical legal standards. *See Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994) ("The law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI."), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995); *Johnson v. Bowen,* 864 F.2d 340, 343 n. 1 (5th Cir. 1988) (per curiam) ("The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program."); *id.* at 343 n. 2 ("The relevant law and regulations governing determination of a disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.").

also claims that he has memory problems and anxiety. The record indicates that he has a ninth (9th) grade education (although the Administrative Law Judge ("ALJ") stated that the Plaintiff has the equivalency of a high school education) and a long history of alcohol abuse.

In 1999, Plaintiff applied for and was denied Social Security benefits. The following year, this benefit request was reconsidered and denied again. Following this second denial, Plaintiff requested and received an administrative hearing, which was held in April of 2001. In July of 2001, the ALJ ruled against the Plaintiff and the Appeals Council denied further review in May of 2002. Plaintiff then filed this appeal in the Southern District of Texas–Corpus Christi Division. In January of 2003, this matter was transferred to this Court due to the fact that the Plaintiff lives in the Brownsville Division.

### B. *Standard of Review*

■ The same standard rules governing summary judgments apply to a review of an administrative denial of social security benefits. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993). While standard summary judgment rules control, the judicial role in social security matters, in-cluding appellate review, is limited by 42 U.S. § 405(g). *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir.1983). This Court may review the ALJ's findings: (1) to determine whether the factual findings are supported by substantial evidence on the record as a whole; and (2) to determine whether the ALJ applied the proper legal standard. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994). It may not weigh the evidence in the record nor retry the issue de novo, nor substitute their judgment for that of the Commissioner—even if the evidence preponderates against the Commissioner's decision. Stated differently, conflicts in the evidence are for the ALJ, not this Court, to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir.1990) (per curiam).

■ Having said this, this Court is not a rubber stamp for the Secretary's decision and is not simply reviewing the record to find evidence to support the ALJ's decision. *See Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir.1985); *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir.1986). Unlike the area of substantial evidence, the ALJ's legal determinations are not afforded the same deference.

### C. *The Administrative Decision* [2]

In the instant case, the ALJ found that the Plaintiff is not engaged in any substan-

2. In making disability determinations, the Commissioner, and ALJs as her proxies, use a five step analysis. *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994) (citing 20 CFR § 404.1520(b)-(f)). These five sequential steps are:

(1) An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a severe impairment will not be found to be disabled.

(3) An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without the consideration of vocational factors.

(4) If an individual is capable of performing the work he/she has done in the past, a finding of not disabled will be made.

(5) If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Id.* The burden of proof fluctuates between the claimant and the Commissioner. *Western v. Harris,* 633 F.2d 1204, 1206 (5th Cir.1981).

tial gainful work. Next, the ALJ determined that the medical evidence established the existence of the conditions about which the Plaintiff complained. She found that the Plaintiff indeed suffers from Hepatitis C, a seizure disorder, and an organic personality disorder. The ALJ found that these conditions were severe, but not severe enough to meet one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Since Plaintiff had no relevant work history, the ALJ proceeded to a determination of his residual functional capacity. This term is defined by regulation as what one is able to do despite his limitations and is used to identify that particular type of work that a person can do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ concluded that the Plaintiff retained functional capacity and then proceeded to describe various kinds of areas at which the Plaintiff could work. Finally, the ALJ determined that these jobs existed in significant numbers in today's economy. These conclusions lead the ALJ to determine that the Plaintiff is not disabled as that term is defined in the Social Security regulations.

### D. *The Administrative Evidentiary Record*

Given the substantial evidence standard of proof, a court's review of an administrative decision is necessarily fact-intensive. *See Randall,* 956 F.2d at 107 (noting "the fact intensive nature of our review"). As with the plaintiff in *Randall,* the instant Plaintiff has a substantial medical history that stretches across a significant expanse of time. *Record* at 57–480. Accordingly, in order to place the parties' contentions in

their proper context, it is first necessary to concisely summarize that history. *Randall,* 956 F.2d at 107; *see also Harrell v. Bowen,* 862 F.2d 471, 475 (5th Cir.1988) (per curiam) ("In applying the 'substantial evidence' standard; we must carefully scrutinize the record to determine if, in fact, such evidence is present.")

At the administrative hearing, three persons testified: the Plaintiff, his wife, and a vocational expert. *Record* at 23. All formal medical evidence was documentary in nature (*i.e.,* no medical experts testified at the administrative hearing). Plaintiff has not worked since approximately 1998–99. *Id.* at 25, 30–32, 46–49. His present claim of disability is premised on the effects of Hepatitis C, an organic personality disorder with depression, and an organic brain syndrome that causes seizures. *Id.* at 25. At the hearing, Plaintiff and his wife testified regarding the following symptoms and conditions: anxiety, paranoia, lack of concentration, dizziness, lightheadedness, fatigue, forgetfulness, balance problems, backache, inarticulateness, feelings of uselessness, memory problems, and frustration. *Id.* at 34, 36–45, 49, 51.

In support of his disability claim, Plaintiff principally relies on the assessments of his treating psychiatrist, Dr. Igoa. The ALJ states that Dr. Igoa concluded that the Plaintiff was disabled in April 2000. *See id.* at 15 (stating ALJ's characterization of Dr. Igoa's medical opinion). However, the ALJ may have misstated the date of Igoa's diagnosis. *See id.* at 478 (April 6, 2001 letter from Dr. Igoa that characterizes Plaintiff as being "totally and permanently disabled for gainful employment").

Initially, the burden rests on the claimant to produce substantial evidence of his disability. *Id.* However, once a claimant meets the burden of showing that she cannot perform her usual line of work, the burden shifts to the Commissioner to show that the claimant is

able to perform some other kind of substantial work available in the economy. *Id.* In the context of the five step analysis, the claimant bears the burden on the first four steps while the Commissioner bears the burden on the fifth. *Greenspan,* 38 F.3d at 236.

The evidentiary basis for Igoa's diagnosis is limited to Igoa's treatment notes for the periods of June through October of 1998 and February of 1999 through April of 2000, a Residual Functional Capacity Assessment completed on July 25, 2000, Igoa's April 6, 2001 letter, and a "Progress Note" of the same date that memorializes an examination. *See id.* at 208–19, 467–76, 478–79.

The ALJ rejected Igoa's conclusion, however, because the former regarded the latter's opinion as being "outside his expertise" and without support "even by his own examinations." *Id.* at 15. As a matter of law, Dr. Igoa's blanket statement of disability, *id.* at 478, is neither dispositive nor entitled to "any special significance." 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1)-(3). The sole documentary evidence that might be marshaled in support of Igoa's April 6, 2001 statement is the "Progress Note" of the same date, which reads states a diagnostic impression of "Organic Affective Disorder" and "Organic Personality Disorder." *Record* at 479. It lists his medications as being "Serzone" and "Vistaril," and records that he reported doing "okay" with the assistance of said medication. *Id.* Igoa stated that Plaintiff was "[p]leasant, appropriate, animated, although with still some symptoms of anxiety and some irritability," and assessed Plaintiff as being "[o]n a good plateau although still not being able to function well." *Id.* No alteration in his treatment plan was suggested, and nothing in the way of diagnostic or laboratory findings is associated with the "Progress Note."

In his 1998 assessment, Dr. Igoa opined that the Plaintiff had poor or no ability to engage in the vast majority of tasks necessary to undertake unskilled work and had "severe depressive symptoms" and "impulse control problems" due to "brain ab-

scess" and lacked the ability to manage benefits in his own interest. *Id.* at 467–69. Yet his treatment and evaluative records are at best unsupportive of said conclusion. Indeed, some of Igoa's records are outright contradictory. For example, on June 16, 1998, Igoa wrote of the Plaintiff:

> In his mood, he acknowledge [sic] some feelings of despondency and depression. Denied any suicidal intent. Thought stream was of normal trend and productivity. Thought content showed no evidence of any well systematize delusional belief. Perceptual disturbances were denied. Intellectually [sic] was well oriented in time, place, person, and circumstances. Memory was good for recall of remote and recent events. Insight was good. Judgment was not overtly impaired socially.

*Id.* at 215. This diagnostic statement is noteworthy, given that Plaintiff premises his disability claim, in part, on paranoia, concentration and memory problems, and an inability to articulate his thoughts aloud. *See id.* at 33–34, 36, 41, 43–44 (Plaintiff's testimony at the administrative hearing). Moreover, Igoa's records from 2000 report improvement and general well-being regarding Plaintiff's condition. *See id.* at 471 (assessing Plaintiff as being "stable"); *id.* at 473 ("Pleasant, appropriate, denied any pervasive feelings of dysphoria. Stated feeling quite well with the above medication regime."); *id.* at 474 (assessing Plaintiff as appearing "to be doing reasonably well"). Even Igoa's 1999 assessments, which feature some agitation, restlessness, and temper, do not really support a conclusion of disability in any straightforward manner. *See id.* at 474–76.

Apart from Dr. Igoa's assessment of the Plaintiff's residual functional capacity and treatment notes, the Record's other evidence consists of various hospital and emergency room records, as well as evalu-

ations by Lynette Heslet, Ph.D.; Albert L. Smith, M.D.; Gale T. Downey, M.D.; Stephen G. Williams, Ph.D.; M. Chappuis, Ph.D.; Henry M. Hanna, Ph.D.; and the testimony of Jerold Hildre, a vocational expert. In her decision, the ALJ reviews portions of the records of each of these sources, excepting Chappuis. Each is examined in turn below.

Hospital records contain diagnoses of anxiety disorder, alcohol abuse, organic personality disorder, convulsive disorder, and depression. *See, e.g., id.* at 173, 176, 179 (1990 records relating to emergency room visit that led to approximately one-week hospital stay). However, even these diagnoses do not appear to support a finding of zero residual functional capacity, particularly given Plaintiff's present disavowal of alcohol usage.[3] *Id.* at 26, 28–29. These same records strongly correlate Plaintiff's symptoms with alcohol abuse and provide evidence that contradicts Igoa's conclusion. *See generally id.* at 173–83 (regarding Plaintiff's alcohol problem); *id.* at 173 ("Thinking was concrete but well organized. Memory for remote events was somewhat hazy but recent memory unimpaired."); *id.* ("Although . . . initially somewhat skeptical about Mr. Alejandro's motivation and his ability to grasp all the concepts of AA he proved to be a very active participant, and indeed he developed a good amount of insight and his motivation for discontinuing his drinking was definitely increased."); *id.* at 179 ("Oriented and in good contact with reality. No thought disorganization. His thinking is a bit on the concrete side, but there is no illogical ideation or looseness of his associations. Level of psychomotor at that

age can best be described as being slightly slow."); *id.* at 183 ("His thinking is well organized, there is no evidence of any volitional, effective, perceptual, or cognitive disorder. Will [discharge] today.").

In 1998, Heslet, a clinical psychologist, conducted a psychological evaluation report, after Plaintiff was referred to her for examination by the Texas Rehabilitation Commission. *See id.* at 198–203 (Heslet's evaluation). Pursuant to this referral, Heslet conducted a diagnostic interview and administered several psychological tests. *Id.* at 198. She diagnosed Plaintiff as suffering from major depression and a personality disorder. *Id.* at 202. She also found the Plaintiff to be "functioning in the Mild Range of Mental Retardation cognitively," but indicated uncertainty regarding causation of Plaintiff's cognitive difficulties. *Id.* In this regard, Heslet indicated that some of the Plaintiff's condition may have stemmed from Plaintiff's "history of polysubstance abuse" and noted that he also lacked of motivation and exhibited an unwillingness to learn. *Id.* In general, Heslet found that Plaintiff was "oriented to person, time, place, and situation"; "logical" in his thought process; "clear and concise" in his speech; and did not evidence any "gross neurological impairments." *Id.* at 199–201.

The more thorough medical records are the 1989 through 2001 records of Dr. Smith. *See id.* at 234–384, 402–41, 477–80. These records principally consist of handwritten notes and laboratory test results. *See id.* No expert testimony regarding their meaning or significance appear in the record. Neither party cites them in their

---

**3.** Alcohol and drug abuse would not necessarily qualify or disqualify Plaintiff from receiving benefits. *See* 20 C.F.R. §§ 404.1525(e), 416.925(e) ("If you have a condition diagnosed as addiction to alcohol and drugs, this will not, by itself, be a basis for determining

whether you are, or are not, disabled. As with any other medical condition, we will decide whether you are disabled based on symptoms, signs, and laboratory findings."). However, as noted above, Plaintiff presently disavows any alcohol consumption. *Id.* at 26.

respective summary judgment motions. The ALJ regarded them as being non-corroborative of Dr. Igoa's opinion. *See id.* at 15.

■ Nonetheless, Smith's records do appear to contain some information that is somewhat corroborative of Plaintiff's claims. In 1998, Dr. Smith wrote that Plaintiff had "some memory difficulties" as a result of "a devistating [sic] meningitis several years ago." *Id.* at 240. More recently in 2001, he reiterated that Plaintiff's conditions have "affected his short-term acquisition of memory." *Id.* at 477. He also stated that Plaintiff's Hepatitis C and liver problems cause "chronic fatigue with dizziness." *Id.* However, these particular findings are not tied to any particular records or testing; in short, they are conclusory and unsupported, as the ALJ noted. *See id.* at 15. As a matter of speculation, Smith's notes may only be reflective of the self-reporting of conditions and symptoms by the Plaintiff.[4] Moreover, although notes from 1994, 1996, and 1999 do take notice of fatigue, for example,

this condition is conjoined with reports of alcohol and/or drug abuse each time, not with any of Plaintiff's present medical conditions. *See id.* at 237, 244, 255. Neither Dr. Smith's records nor his report conclude that the Plaintiff is disabled.

In 1999, Dr. Downey conducted a neurological assessment of the Defendant at the request of the Texas Rehabilitation Commission. *Id.* at 385–86. This assessment was founded on a single in-person visit and the administration of certain tests. *Id.* at 385. Downey concluded that the Plaintiff was "[n]eurologically normal" with "no restrictions from a neurological standpoint." *Id.* at 386. En route to this conclusion, Downey remarked that Plaintiff's "[t]hought processes were intact with patient demonstrating adequate ability to follow instructions," that his physical movements seemed normal, and that he was otherwise within human neurological norms. *Id.* at 385–86.

Clinical psychologist Williams also conducted a psychological evaluation of Plaintiff at the request of the Texas Rehabilita-

4. When a medical opinion is premised on self-reporting and is otherwise unsubstantiated by the record, an ALJ may properly disregard said opinion. *See, e.g., Liessmann v. Barnhart,* No. 02–2070, 2002 WL 31450793, at \*4 (10th Cir. Nov.4, 2002) (unpublished opinion) (affirming ALJ's failure to credit opinion of examining physician "who saw [the claimant] for only one hour, admitted that he had no test data and thus could only base his opinion about [the claimant's] disability or her 'self-report' "); *Mastro v. Apfel,* 270 F.3d 171, 177–78 (4th Cir.2001) (affirming ALJ's disregard of treating physician's opinion because said opinion "was based largely upon the claimant's self-reported symptoms" and was not supported by the objective medical evidence). Such is especially the case when the claimant's credibility is itself in doubt. *See, e.g., Brown v. Apfel,* No. 99–1688, 2000 WL 777939, at \*1 (8th Cir. June 19, 2000) (per curiam) (unpublished opinion) (affirming ALJ's refusal of examining physician's "one-time assessment, which was based on [the

claimant's] self-reported symptoms and his performance on tests" in situation in which ALJ had also "discredited [the claimant's] subjective complaints of pain"); *Rankin v. Apfel,* 195 F.3d 427, 430 (8th Cir.1999) ("[The treating physician's] conclusion, however, is based heavily on [the claimant's discredited] subjective complaints and is at odds with the weight of the objective evidence . . . ."); *Morgan v. Commissioner of the Social Security Administration,* 169 F.3d 595, 602 (9th Cir. 1999) ("A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.' ") (quoting *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989)). In *Morgan,* the Ninth Circuit affirmed an ALJ's failure to credit the opinions of a treating psychiatrist and an examining psychologist on this basis in part. *Id.* In the instant case, the ALJ found that the Plaintiff's "testimony [was] not credible to the extent alleged." *Record* at 16.

tion Commission in 1999. *Id.* at 387–91. The evaluation consisted of an assessment of Plaintiff's IQ and his mental status. *Id.* at 387–88. Williams found Plaintiff's IQ to be "within the Average range of intellectual functioning." *Id.* at 388. Although Plaintiff's "[g]ait was rather slow" and there was "evidence of significant depression," his "[p]sychomotor speed was regular," his speech was normal, and his thought processes "were appropriate, coherent and goal-directed." *Id.* at 389. Regarding Plaintiff's memory, Williams wrote that it "was somewhat limited for recent events, but better for remote and intermediate events." *Id.* at 390. In addition, Williams found that Plaintiff's "[c]oncentration was good" and "[p]ersistence was fair," albeit Plaintiff's "[p]ace was slow." *Id.* Williams's evaluation also concluded that Plaintiff "is able to read the newspaper and understand radio/TV newscasts" and capable of most basic everyday life functions (*e.g.*, driving, paying bills, preparing meals). *Id.*

In addition, the record contains evaluations of Plaintiff conducted by the Vocational Rehabilitation Division's Disability Determination Services in 1998 and 1999–2000. *Id.* at 204–07, 220–28, 392–400. The 1998 evaluation was conducted by M. Chappuis, Ph.D. and includes a psychiatric review and a mental residual functional capacity assessment. *Id.* at 204–07, 220–28. The 1999–2000 evaluation was conducted by Henry M. Hanna, Ph.D. and consisted of another psychiatric review. *Id.* at 392–400.

The former found that Plaintiff has severe impairments, thereby necessitating a mental residual functional capacity assessment. *Id.* at 220. However, Chappuis also noted that the Plaintiff's claims that his ills stemmed from his 1985 brain abscess were "not generally credible" and determined that Plaintiff's "symptoms im-

prove when he stops alcohol." *Id.* at 221. Indeed, Chappuis concluded that, "[t]he longitudinal MER demonstrates that the primary and chronic condition is alcohol abuse, with intermittent marijuana." *Id.* Chappuis also determined that Plaintiff "does not meet the requirements for mental retardation." *Id.* (One should note that other examiners, such as Heslet, found the Plaintiff to be mildly retarded and to have diminished IQ scores. *See Record* at 202. Such medical findings, however, do not necessarily coincide with the regulatory definition of mental retardation.) Although Plaintiff was found to "often" suffer "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner," "often" was the middle designation on a continuum running from "never" to "constant." *Id.* at 227. Notwithstanding the recognition of the existence of impairments, Chappuis's residual functional capacity assessment concluded that Plaintiff's understanding, memory, concentration, persistence, social skills, and ability to adapt were either not significantly limited or only moderately limited. *Id.* at 204–05. Chappuis concluded that Plaintiff "is able to carry out routine tasks that do not require him to be responsible for the safety of others; he should not operate vehicles or hazardous machinery." *Id.* at 206.

Hanna assessed Plaintiff as having affective disorders, mental retardation, and autism, yet nevertheless concluded that Plaintiff's impairments were not severe. *Id.* In particular, Hanna felt that Plaintiff has a depressive disorder and a learning disorder and noted that Plaintiff's recent memory was a problem. *Id.* at 393, 395–96. But in spite of the foregoing negative assessments, Hanna found that Plaintiff's thought processes were "appropriate, coherent, goal-directed," that his concentration was "good" and that he had "fair" persistence. *Id.* at 393. Hanna also re-

garded Plaintiff's insight and judgment to be within normal limits. *Id.* In the end, he found Plaintiff's allegations "somewhat credible but not disabling" and regarded Plaintiff's degree of limitation regarding daily living activities and social functioning to generally be "slight" (on a sliding scale from "none" to "extreme"). *Id.* at 393, 399. Likewise, Hanna concluded that Plaintiff "seldom" (on a sliding scale from "never" to "constant") suffered from deficiencies in concentration, persistence, or pace. *Id.* at 399.

Finally, vocational expert Jerold Hildre testified at the hearing. *Id.* at 52–55. Hildre's testimony was not concerned with any assessment of the Plaintiff's condition. Instead, the ALJ propounded various hypothetical questions in order to determine what significant employment would be available to persons in the Plaintiff's area, accounting for certain variables (*e.g.*, inability to engage in fast-paced work). *Id.* Depending on the variables, Hildre testified as to whether employment opportunities would be available or unavailable. *Id.* Hildre testified that Plaintiff could work in a laundry or restaurant. (The latter conclusion may not be totally correct given the fact that the Plaintiff has Hepatitis C.)

### E. *Issues On Appeal*

On Appeal, the Plaintiff has raised the following issues:

1) Did the ALJ Commit Error By Not According Any Weight to Dr. Igoa's Conclusion of Disability?

2) Did the ALJ Improperly Discount Plaintiff's Organic Affective Disorder?

3) Did the ALJ Commit Error By Failing to Re–Contact Dr. Igoa?

4) Did the ALJ Shirk Her Duty to Fully and Fairly Develop the Plaintiff's Case?

5) Did the ALJ Commit Error By Ignoring the Findings of the State Agency Medical Consultant(s)?

6) Did the ALJ Commit Error By Disregarding the Testimony of the Vocational Expert?

Each complaint is addressed in turn.

### F. *Did The ALJ Commit Error By Not According Any Weight To Dr. Igoa's Conclusion Of Disability?*

■ Plaintiff argues that the ALJ erred by holding that the opinions of treating psychiatrist Jose Igoa, M.D., were " 'not entitled to any weight' " due to the fact that they were allegedly not supported by Igoa's own examinations and inconsistent with the remainder of the record. *Docket No. 29* (quoting ALJ); *see Record* at 15 (ALJ's opinion). Plaintiff maintains that this finding is in direct violation the standards announced in a Social Security Ruling. *Docket No. 29; see* SSR 96–2p at *4 (stating that if "a treating source medical opinion is not well supported ... or is inconsistent with the other substantial evidence in the case record" it "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected"). Moreover, Plaintiff argues that in order to discount the treating physician's opinions, an ALJ must account for the factors set forth in 20 C.F.R. § 404.1527(d)(2). *Docket No. 29.* Plaintiff argues that the ALJ failed to do so. *Id.*

The Defendant has two responses to Plaintiff's argument. First, Defendant asserts that Fifth Circuit case law allows an ALJ to assign no weight to a treating physician's opinion for good cause, and that assertions by medical experts that a claimant is disabled are, in general, irrelevant to determinations of disability status under the Social Security regulations. *Docket No. 31* (citing *Newton v. Apfel,* 209 F.3d 448 (5th Cir.2000) and *Frank v.*

*Barnhart,* 326 F.3d 618 (5th Cir.2003) (per curiam)). Defendant also insists that the aforementioned case law is perfectly consistent with the text of SSR 96–2p. *Id.* Second, the Defendant maintains that the factors enumerated in the Code of Federal Regulations were discussed in the ALJ's opinion, albeit in narrative fashion. *Id.*

The law in this area is somewhat involved. All medical opinions are to be considered in determining the disability status of a benefits claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as disability status under the regulations are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. *Id.*

The regulations break medical source opinions down into three general categories: nonexamining, nontreating, and treating. 20 C.F.R. §§ 404.1502, 416.902. Nonexamining sources are those whose assessments are premised solely on a review of medical records. *Id.* State agency medical consultants consulted by the ALJ fall into this category. *Id.* Nontreating sources are those who have examined the claimant, but who do not have "an ongoing treatment relationship" with same. *Id.* This "term includes an acceptable medical source who is a consultative examiner . . . when the consultative examiner is not [a claimant's] treating source." *Id.* Finally, medical sources who have had an "ongoing treatment relationship" with the claimant are regarded as treating sources. *Id.*

At one time, ALJs enjoyed considerable discretion in assessing the weight to accord the opinions of treating physicians. *See, e.g., Bradley v. Bowen,* 809 F.2d 1054, 1057 (5th Cir.1987) (per curiam) ("If the

ALJ could properly reject the conclusions of a treating physician in favor of a non-examining physician, as was approved in *Oldham,* certainly the ALJ is free to choose among the conclusions of two examining physicians, even though one is the claimant's treating physician."); *see also Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.1995) (per curiam) (quoting *Bradley* for the proposition that ALJs are " 'free to reject the opinion of any physician when the evidence supports a contrary conclusion' "); *Muse v. Sullivan,* 925 F.2d 785, 790 (5th Cir.1991) (per curiam) (citing *Bradley* for the proposition that "[t]he ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the evidence"). However, since *Bradley,* the legal standard has evolved in a manner that substantially confines said discretion. *See Hudson v. Apfel,* No. 3:99–CV–946–AH, 2000 WL 547121, at *2–4 (N.D.Tex. May 3, 2000) (unpublished opinion) (regarding *Bradley* and *Oldham* as "out-dated" and outlining the more stringent standards for disregarding the medical opinions of treating physicians stated in *Newton* ).

In *Newton,* the court of appeals reviewed a decision in which an ALJ effectively gave a treating physician's assessment "no weight." *Newton,* 209 F.3d at 455. The ALJ had reasoned that the treating physician's opinion was "insufficiently substantiated by clinical or diagnostic evidence" and that said physician's own assessments were contradictory. *Id.* Construing 20 C.F.R. § 404.1527(d), SSR 96–2p, and SSR 96–5p, the court reversed and remanded. *Id.* at 455–58.

The regulations at issue in *Newton* also lie at the heart of the present dispute. These regulations generally require ALJs to "give more weight to opinions from . . . treating sources" on account of their com-

paratively greater familiarity with a claimant's medical condition(s). 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Indeed, when "a treating source's opinion on . . . the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [one's] case record, [the ALJ] will give it controlling weight." *Id.* That is, the opinion "must be adopted." SSR 96–2p at *1. But only opinions regarding the nature and severity of impairments are entitled to such weight. *Id.* at *2.

Even if not given controlling weight, a treating source's medical opinion(s) should not necessarily be disregarded. *See id.* at *4 ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). Instead, when not accorded controlling weight, treating sources' medical opinions are to be assessed in light of multiple factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). These factors include the (a) duration of the treatment relationship and frequency of examination, (b) "[n]ature and extent of the treatment relationship," (c) supportability of the source's opinions in light of the relevant medical evidence and reasoning, (d) consistency of proffered opinions with the remainder of the record, (e) expertise of the medical source, and (f) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). The regulations at least imply that these factors will be canvassed in administrative decisions when relevant by concluding the section that imposes these requirements with the advisory language that "we will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §§ 404.1527(d), 416.927(d). An-

other section specifies that, when ALJs fail to accord controlling weight to treating sources, the weight ascribed to the various treating, nontreating, and nonexamining sources must all be explained. 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii); *see also* SSR 96–2p at *5; SSR 96–5p at *6.

Notwithstanding the language of the aforesaid provisions, an " 'ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,' " including the opinions of treating physicians. *Newton,* 209 F.3d at 455 (quoting *Brown v. Apfel,* 192 F.3d 492, 500 (5th Cir.1999)). However, when the opinions of treating physicians are "assigned little or no weight," an ALJ's assignation must be predicated on "good cause." *Id.* at 455–56. Good cause exists when a treating source's opinion is conclusory, unsupported by medically acceptable evidence, or is otherwise bereft of substantial support. *Id.* at 456. Under certain circumstances, like those faced in *Newton,* good cause must be demonstrated in writing by an ALJ via consideration of each of the factors enumerated in 20 C.F.R. §§ 404.1527(d), 416.927(d). *See id.* ("This court now similarly holds that an ALJ is required to consider each of the § 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist. The ALJ failed to perform this analysis, which should be conducted on remand.").

In the instant case, the ALJ did not explicitly and specifically reference the factors enumerated in 20 C.F.R. §§ 404.1527(d), 416.927(d) with reference to Igoa's opinions. *See Record* at 15. Such explicit consideration would certainly be the better practice. The ALJ did discuss some of the relevant factors in narrative form (*i.e.,* the supportability of Igoa's opinions in light of the relevant medical evidence and reasoning, the consistency of

Igoa's opinions with the remainder of the record, Igoa's expertise). *Id.* The ALJ's narrative discussion also omits some of the listed factors (*i.e.,* the duration of Igoa's treatment relationship with the claimant and the frequency of Igoa's examinations, the nature and extent of Igoa's treatment relationship with the claimant). *See id.* Nonetheless, to the extent that any such omission might otherwise constitute error under *Newton,* it does not appear that the instant case falls within *Newton*'s ambit.

Notwithstanding any broader language in the opinion, *Newton* confines its holding to certain limited circumstances. Discussing the facts before it, the *Newton* court opined that, "[t]his is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *Newton,* 209 F.3d at 458. The court of appeals also noted that it was not confronted with a case in which "the ALJ weigh[ed] the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* As the court of appeals elaborated, *Newton* was, "[i]nstead ... a case where the ALJ summarily rejected the opinions of [the claimant's] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Id.* Moreover, the medical record was incomplete.[5] *Id.*

In making the aforesaid characterizations, the *Newton* court cited two cases that it thought were distinguishable from the factual scenario before it: *Spellman v. Shalala,* 1 F.3d 357 (5th Cir.1993) and *Prosch v. Apfel,* 201 F.3d 1010 (8th Cir. 2000). *Newton,* 209 F.3d at 458 (citing both cases). In *Spellman,* the court of appeals let stand an administrative ruling that disregarded a treating physician's opinion because it ran counter to the substantial medical evidence in the record. *See Spellman,* 1 F.3d at 365 ("The Appeals Council acted within its discretion in rejecting the treating physician's opinion that [the claimant] could not perform sedentary work, because [the treating physician's] opinion was inconsistent with the other substantial evidence in the record."). In *Prosch,* the Eighth Circuit affirmed an ALJ's rejection of a treating source's assessment in favor of opinions proffered by three examining physicians. *Prosch,* 201 F.3d at 1012–14. In so holding, the court of appeals stated that internal inconsistencies amongst the evidence submitted by the treating physician as well as its external inconsistencies with the evidence submitted by examining physicians both constituted sound reasons for disregarding the opinion of the treating physician. *Id.* at 1013–14. One can only assume that the *Newton* court's comparative citation of the *Spellman* and *Prosch* opinions was designed to limit the scope of its own holding

---

5. District courts have recognized the qualified nature of *Newton*'s holding. *See, e.g., Castille v. Barnhart,* No. Civ. A. 01–2664, 2002 WL 1900815, at *6 (E.D.La. Aug.13, 2002) (unpublished opinion) (stating that *Newton* is limited to situations where contrary reliable medical evidence from a treating or examining physician is not available); *Contreras v. Massanari,* No. Civ. A. 1:00CV242, 2001 WL 520815, at *4 (N.D.Tex. May 14, 2001) (unpublished opinion) ("*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant."); *Frank v. Massanari,* No. Civ. A. 99–3038, 2001 WL 664594, at *3 (E.D.La. June 12, 2001) (unpublished opinion) (distinguishes *Newton* as applying to situations "in which there is no competing first-hand medical evidence on which an administrative court can base its factual determination").

by excluding the sort of factual scenarios addressed in *Spellman* and *Prosch*.

Two cases decided subsequent to *Newton* reinforce the understanding that *Newton*'s holding is limited to the specific factual context addressed therein. In *Myers v. Apfel*, 238 F.3d 617 (5th Cir.2001) (per curiam), the court of appeals reversed and remanded a district court's affirmance of an ALJ's denial of benefits on the basis of *Newton*. *Myers*, 238 F.3d at 621. Although citing *Newton* for a broader proposition along the way (*i.e.*, that "[a]n ALJ must always consider the [20 C.F.R. §§ 404.1527(d), 416.927(d) ] factors before declining to give any weight to the opinions of a treating doctor"), the court pointed out that it was reversing and remanding because it was likewise faced with " 'a case where the ALJ summarily rejected the opinions of [Myers's] treating physician, based only on the testimony of a nonspecialty medical expert who had not examined the claimant.' " *Id.* (quoting *Newton*, 209 F.3d at 458). More recently, the Fifth Circuit characterized *Newton* as merely "requiring, *in the absence of competing first-hand medical evidence*, that the ALJ consider each of the § 404.1527(d) factors in evaluating the medical opinion of a treating physician." *Frank*, 326 F.3d at 620 (emphasis added).

■ The instant case more closely resembles *Spellman* and *Prosch* than it does *Newton* or *Myers*. The ALJ did not summarily reject the opinion of the treating source. The ALJ summarized almost the entire medical record before her. *Record* at 13–16. Dr. Igoa is Plaintiff's treating physician, but his conclusion that Plaintiff "was disabled in April 2000," *Record* at 15, by regulatory definition is not a medical opinion and is therefore not entitled to any deference or consideration under the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d). *Frank*, 326 F.3d at 620. Regarding Dr. Igoa's legitimate medical opinions, the ALJ determined that, "since the opinions expressed by Dr[.] Igoa are not supported by the examinations and testing and are inconsistent with the record they are not entitled to any weight." *Record* at 15. In this regard, the ALJ relied upon the competing assessments of experts who had examined the Plaintiff for themselves. *See Record* at 14–15 (discussing assessments of Drs. Lynette Heslet, Ph.D.,[6] Stephen G. Williams, Ph.D.,[7] and Gale T. Downey, M.D.[8]). Indeed, the ALJ went further, finding that Igoa's own records contradicted his assessment of disability. *Record at 15.* "If the case record," as here, "contains an opinion from a medical source," Dr. Igoa, "on an issue reserved to the Commissioner [*i.e.*, Plaintiff's disability status], the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96–5p at *3. The ALJ undertook such an analysis,

**6.** Heslet, a clinical psychologist, found the Plaintiff to be "functioning in the Mild Range of Mental Retardation cognitively." *Record* at 202. However, she also qualified this observation by noting that Plaintiff's "history of polysubstance abuse" complicated any such assessment and additionally noting that Plaintiff "exhibit[ed] low motivation and little initiative." *Id.*

**7.** Williams, also a clinical psychologist, more recently found Plaintiff to be "within the Average range of intellectual functioning." *Rec-*

*ord* at 388. He concluded that Plaintiff's intellectual factors, fund of information, insight, and judgment were all "within normal limits" as well and that Plaintiff could successfully carry out a variety of mundane tasks. *Id.* at 390

**8.** Downey found Plaintiff to be "[n]eurologically normal" and concluded that "he has no restrictions from a neurologic standpoint at this time." *Record* at 386.

albeit omitting some material.[9] *Record* at 13–16. " 'Conflicts in the evidence are for the Commissioner and not the courts to resolve.' " *Newton,* 209 F.3d at 452 (quoting Fifth Circuit case law). "The court's role is to scrutinize the entire record to ascertain whether substantial evidence supports the Commissioner's findings." *Rangel v. Massanari,* No. CIV.A.1:00–CV–210–C, 2001 WL 770973, at *2 (N.D.Tex. July 3, 2001) (unpublished opinion) (relying on *Hollis v. Bowen,* 837 F.2d 1378, 1383 (5th Cir.1988)). Such review reveals that the ALJ has reasonably resolved all such conflicts and that the record more than adequately bears out her conclusions.

### G. Did the ALJ Improperly Discount Plaintiff's Organic Affective Disorder?

■ Plaintiff argues that the ALJ improperly disregarded the treating physician's diagnosis of Organic Affective Disorder ("OAD"). *Docket No. 29.* Because there purportedly was no contradictory medical evidence, Plaintiff argues that the ALJ was required to discuss the factors enumerated in 20 C.F.R. § 404.1527(d)(2) before discounting Plaintiff's OAD. *Id.* Plaintiff maintains that the ALJ failed to do so. *Id.*

Defendant denies that the ALJ discounted or disregarded Plaintiff's OAD. *Docket No. 31.* Defendant maintains that the ALJ acknowledged that Plaintiff has OAD. *Id.* In addition, the Defendant also maintains that, "[t]he question is not whether Plaintiff had these or other conditions, but rather whether they totally precluded his ability to perform all work related activities." *Id.* (citing *Johnson v. Sullivan,* 894

F.2d 683 (5th Cir.1990) and 20 C.F.R. § 416.925). Notwithstanding Plaintiff's OAD, Defendant argues that the record validates the ALJ's judgment that Plaintiff is not disabled within the meaning of the Social Security regulations. *Id.*

The ALJ did not, in fact, discount the Plaintiff's OAD or Dr. Igoa's diagnosis thereof. At the outset of the opinion's canvassing of the medical evidence in the record, the ALJ flatly states that, "[t]he medical evidence indicates that the claimant has [a] seizure disorder, controlled, Organic Personality Disorder with depression and Hepatitis C, impairments that are severe within the meaning of the Regulations." *Record* at 13–14. As the Commissioner maintains on appeal, given that the ALJ's inquiry proceeded to the fifth step of the five-step analysis, the matter at issue is, whether Plaintiff's OAD, either alone or in tandem with his other conditions, renders Plaintiff disabled rather than whether Plaintiff's conditions exist. *See, e.g., Johnson,* 894 F.2d at 685 ("Although he diagnosed Johnson as suffering from a degenerative disc disease, he concluded that when Johnson took the prescribed painkilling medicine, he was able to function well."). Plaintiff's objection, therefore, is without merit.

### H. Did the ALJ Err By Failing to Re–Contact Dr. Igoa?

■ Citing SSR 96–5p and 20 C.F.R. § 404.1512(e), Plaintiff contends that anytime that a treating physician's evidence does not support the treating physician's opinion, the ALJ must make a reasonable effort to re-contact the physician in order

---

**9.** Although an ALJ must provide "good reasons" regarding the weight given to a treating source's opinion, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), an ALJ does not have an obligation to exhaustively discuss the record in her decision. *See Cotter v. Harris,* 650 F.2d 481, 482 (3d Cir.1981) ("[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice.").

to clarify the basis for the opinion. *Docket No. 29.* That is, Plaintiff contends that the ALJ was obligated to re-contact Dr. Igoa before disregarding the latter's opinion. *Id.* It is undisputed that the ALJ did not re-contact Dr. Igoa. *Docket Nos. 29, 31.*

Defendant responds by invoking 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) and arguing that an ALJ's duty to re-consult a treating source is limited to two situations: (1) when the evidence in the record is consistent but insufficient; or (2) when, after weighing the evidence, the ALJ is unable to come to a conclusion. *Docket No. 31.* Defendant argues that neither scenario is applicable in this case. *Id.* Defendant contends that the record is fully developed and supports the ALJ's decision. *Id.* Moreover, Defendant contends that Plaintiff would have to show that prejudice resulted from a failure to re-contact (*i.e.,* that subsequent contact would have adduced additional information that might have altered the ALJ's decision) in order to obtain relief from the ALJ's decision. *Id.* (citing *Bowling v. Shalala,* 36 F.3d 431 (5th Cir.1994) and *Ripley v. Chater,* 67 F.3d 552 (5th Cir.1995)). Finally, Defendant argues that, to the extent that the ALJ was under a duty to obtain further information, the two consultative examinations to which the ALJ sent the Plaintiff fulfilled that duty. *Id.*

A colorable case for the Plaintiff's position can be premised on SSR 96–5p, the text of which states, in relevant part, that:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner *and the adjudicator cannot ascertain the basis of the opinion from the case record,* the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR–96–5p, at *6 (emphasis added). However, the emphasized language unravels Plaintiff's position. SSR 96–5p does not say that ALJs must recontact a treating physician whenever the record as a whole (or a treating physician's particular contribution to the record) fails to support his opinions. To the contrary, SSR 96–5p requires recontact solely when both (a) the record fails to support a treating source's opinion, and (b) the basis of the treating source's opinion is unascertainable from the record. The ALJ does not express confusion regarding the basis of Dr. Igoa's opinion; instead, she concludes that the purported basis for his opinion does not lend any support to said opinion. *Record at 15.* This distinction is dispositive; the ALJ had no obligation to recontact Dr. Igoa, because the ALJ's failure to credit Igoa's assessment was not based on a inability to determine the basis of Igoa's opinion, but rather an absence of evidence that supported Igoa's conclusions.

The relevant Social Security regulations reinforce the foregoing reading of SSR96–5p. The regulations pertaining to evidence of impairments provide that medical sources will be recontacted "[w]hen the evidence ... receive[d] from [a] treating physician ... is inadequate ... to determine whether [a claimant] is disabled." 20 C.F.R. §§ 404.1512(e), 416.912(e). These regulations further provide "additional evidence or clarification" will be sought "when the report from [a] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). Another regulation pertaining to the evaluation of opinion evidence mirrors the foregoing provision. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("If

the evidence is consistent but we do not have sufficient evidence ... or, if after weighing the evidence ... we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence ...."). Yet another provision makes it perfectly clear that ALJs may render a decision notwithstanding the existence of inconsistent evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have.").

Fifth Circuit case law likewise suggests that the ALJ was under no obligation to recontact Igoa under the circumstances of this case and that remand on this basis would be inappropriate. *See, e.g., Spellman,* 1 F.3d at 365 ("The Appeals Council acted within its discretion in rejecting the treating physician's opinion that Spellman could not perform sedentary work, because Dr. Davis's opinion was inconsistent with the other substantial evidence in the record."); *cf. Newton,* 209 F.3d at 453 (requiring that, "if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, *absent other medical opinion evidence based on personal examination or treatment of the claimant,* the ALJ must seek clarification or additional evidence from the treating physician") (emphasis added). As noted previously, there is a wealth of contradictory opinion and evidence from other medical sources who personally examined the Plaintiff.

### I. *Did the ALJ Shirk Her Duty to Fully and Fairly Develop the Plaintiff's Case?*

In conjunction with the forgoing issue, Plaintiff avers that the ALJ "failed in her duty to fully and fairly develop plaintiff's

case." *Docket No. 29* (citing *Kane v. Heckler,* 731 F.2d 1216 (5th Cir.1984)). Although Plaintiff lists this particular claim (*i.e.,* failure to develop the case) as a separate point of appeal, it receives no separate attention beyond the citation to *Kane. See id.*

Defendant likewise devotes little argument to this issue. *See Docket No. 31.* Defendant's sole direct response appears to be the contention that, "[t]o the extent that she was required to do so, the ALJ fully developed the record." *Id.* Given the initial qualifying language, it is not altogether clear that Defendant even acknowledges that any separate duty to develop the case exists under the facts of this litigation. Regarding this issue, Defendant generally appears to rely on her contentions regarding the preceding three issues and her argument that the record adequately supports the ALJ's decision.

■ An "ALJ has a [general] duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley,* 67 F.3d at 557; *see also Pierre v. Sullivan,* 884 F.2d 799, 802 (5th Cir.1989) (per curiam) ("It is the duty of the ALJ to fully and fairly develop the facts relative to a claim for benefits. When he fails in that duty, he does not have before him sufficient facts on which to make an informed decision .... [and] his decision is not supported by substantial evidence."). This duty is heightened when, unlike here, the claimant is pursuing benefits without the aid of an attorney. *See Bowling,* 36 F.3d at 437 ("When claimant is unrepresented by counsel, he ALJ has a duty 'scrupulously and conscientiously [to] probe into, inquire of, and explore for all of the relevant facts.'"); *Kane,* 731 F.2d at 1219 ("The ALJ's 'basic obligation to develop a fair and full record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedures appears before him.'"). Even when a

claimant is represented by counsel, the ALJ remains duty-bound to fully and fairly develop the record. *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir.1996). Nonetheless, even under the heightened duty of inquiry applicable to pro se claimants, a claimant must demonstrate, or at least meaningfully suggest, prejudice in order to obtain reversal and remand. *Compare Bowling,* 36 F.3d at 437 ("We shall, however, reverse an ALJ's decision for failure to develop the record adequately only if a claimant shows that he was prejudiced as a result of the hearing."), *with Kane,* 731 F.2d at 1220 ("While [the plaintiff] has made no proffer of such evidence in the district court, as she should have properly done, the statements by her counsel at oral argument concerning what she would have testified had the ALJ made proper inquiry are at least plausible."). "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Ripley,* 67 F.3d at 557 n. 22 (citing *Kane,* 731 F.2d at 1220). Even if this case were analogous to the inadequate inquiry line of cases,[10] Plaintiff has not adduced any additional evidence; nor has Plaintiff indicated the nature of any such evidence. Plaintiff has thereby failed to even attempt to demonstrate prejudice.

### J. Did the ALJ Err By Ignoring the Findings of the State Agency Medical Consultant?

■■■ Plaintiff argues that the ALJ violated standards set forth in SSR 96–6p by ignoring the findings of state agency medical consultants ("SAMCs"). *Docket No. 29.* The SAMCs are alleged to have found certain medical conditions, which the ALJ discounted in part or entirely. *Id.* Plaintiff maintains that the ALJ was required to either accord significant weight to the SAMCs' findings or to explain why she chose not to do so. *Id.* As the ALJ purportedly did not even reference certain of the SAMCs' findings in her decision, Plaintiff argues that the ALJ improperly disregarded the SAMCs' findings. *Id.*

Defendant counters that neither it nor the ALJ contested the findings of the SAMCs. *Docket No. 31.* Instead, the Defendant appears to argue that the SAMCs' findings are not inconsistent with the ALJ's ruling. *Id.* In addition, the Defendant argues that the one notable SAMC finding that might be regarded as being inconsistent with the ALJ's decision may be disregarded as it is premised exclusively on subjective self-reporting by the Plaintiff. *Id.*

In advancing his argument regarding the SAMCs, the Plaintiff adverts to the findings of Chappuis and Williams in particular. *Docket No. 29.* The ALJ does not reference the findings of the former whatsoever. Regarding the latter, the ALJ does discuss his findings at some length, *Record at 14,* but fails to discuss the particular details highlighted by the Plaintiff.

There is no doubt that the first failure (*i.e.,* entirely failing to discuss Chappuis's findings) runs afoul of the Social Security

---

10. This case is nothing like the inadequate inquiry line of cases. *Cf. Kane,* 731 F.2d at 1218 (ALJ conducted five-minute hearing that was transcribed on a mere four pages and asked a single question of pro se claimant). Moreover, the duty of full and fair inquiry has been held to be satisfied in cases that were not terribly far removed from *Kane. See, e.g.,* *Carrier v. Sullivan,* 944 F.2d 243, 245 (5th Cir.1991) (per curiam) (deciding that twenty-six minute hearing that generated sixteen pages of testimony and featured extensive questioning was sufficient); *James v. Bowen,* 793 F.2d 702, 704–05 (5th Cir.1986) (holding ten minute hearing in which ALJ meaningfully questioned pro se claimant to be adequate).

regulations. Although ALJs "are not bound by any findings made by State agency medical or psychological consultants," they must consider such findings as opinion evidence. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). In instances in which the treating physician's opinion is not accorded controlling weight, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . as the administrative law judge must do for any opinions from treating sources." 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). An ALJ's assessment of nonexamining source opinions are otherwise subject to the same basic rules of evaluation as those imposed on treating sources. 20 C.F.R. §§ 404.1527(f), 416.927(f). The failure to discuss a particular aspect of Williams's findings may also run afoul of the Social Security regulations due to the requirement to evaluate all medical opinions with reference to the factors enumerated in 20 C.F.R. §§ 404.1527(d), 416.927(d) whenever a treating source's opinion does not receive controlling weight. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) ("Unless we give a treating source's opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to *any* medical opinion") (emphasis added).

Failure to adhere to the procedures proscribed by the Social Security regulations is sufficient ground for reversal and remand of an administrative decision. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir.1987) ("There are specific rules of law that must be followed in deciding whether evidence is substantial in these disability cases. The failure of the ALJ and the Appeals Council to follow certain of these rules in this case is reversible error."). Courts have remanded for failure to comply with the regulations at issue here. *See, e.g., Mayfield v. Barnhart*, No. 01 C 9418, 2003 WL 223310, at *9 (N.D.Ill. Jan.30, 2003) (unpublished opinion) (reversing and remanding for failure to adhere to procedures specified by 20 C.F.R. § 416.927(f)(2) and SSR 96–6p).

However, courts have also declined to reverse and remand on procedural grounds when it is clear that the procedural error did not compromise the decision-making process. *See, e.g., Davis v. Barnhart*, No. 01–35946, 2003 WL 21751851, at *2 (9th Cir. July 28, 2003) (unpublished opinion) (disregarding ALJ's failure to explain why SAMC's findings were disregarded, notwithstanding acknowledgment of SSR 96–6p's requirements, because "the ALJ's ultimate conclusion was supported by substantial evidence"). Refusal to remand in cases like *Davis* is commonsensical in terms of the rationale for the procedural requirements of Social Security proceedings inasmuch as the requisite procedures exist solely to guarantee an accurate assessment of the evidence. *See Frank v. Massanari*, No. Civ. A. 99–3038, 2001 WL 664594, at *2 (E.D.La. June 12, 2001) (unpublished opinion) (articulating standard of review in social security decisions as being "limited to two [interrelated] inquiries: (1) whether the decision is supported by substantial evidence in the record and (2) whether the proper legal standards were used in evaluating the evidence"). As a logical matter, it makes little sense to reverse and remand for technical failings that do not influence the outcome, and the law is replete with examples of this principle outside of the Social Security context. *See, e.g.,* FED. R. CIV. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); FED. R. CRIM. P. 52(a) ("Any error, defect, irreg-

ularity, or variance that does not affect substantial rights must be disregarded."). Within the Social Security context, this principle is especially salient. The sheer volume of administrative proceedings [11] necessitates that the courts not further burden the SSA with remand of futile claims. *Cf. Perreault v. Massanari*, No. CIV. 3–00–CV–10228, 2001 WL 1398405, at *3 (S.D.Iowa Oct.26, 2001) (unpublished opinion) ("Remand for further proceedings under these circumstances would merely add to the Commissioner's heavily burdened caseload and needlessly delay plaintiff's award of benefits."); *Ellis v. Bowen*, No. 88–0285–CV–W–9–3, 1989 WL 281923, at *7 (W.D.Mo. Apr.11, 1989) (unpublished opinion) ("However, where the record is adequate for a final determination to be made and the record as a whole is overwhelmingly in support of a finding of disability a remand would be a futile gesture and a waste of the parties' and the court's resources.").

Accordingly, courts have adopted what amounts to a "harmless error" standard of review regarding matters of administrative procedure in Social Security cases. *See, e.g., Williams v. Chater*, No. 94–5237, 1995 WL 490280, at *2 (10th Cir. Aug.16, 1995) (unpublished opinion) ("Procedural imperfection that does not affect a party's substantive rights is not a basis for reversal."); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ("So the administrative law judge's opinion is vulnerable. But that is nothing new. No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion

unless there is reason to believe that the remand might lead to a different result."). The Fifth Circuit embraces this harmless error rule as well. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) (per curiam) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected.... The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time.") (internal citations omitted); *see also Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir.1989) (per curiam) (reiterating *Mays*'s harmless error passage); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988) (per curiam) (relying on *Mays* in holding that "procedural improprieties ... will ... constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision").

If failure to consider an SAMC's findings altogether (or, at the very least, failure to document said consideration) may constitute harmless error, *a fortiori* the failure to consider every single opinion or statement of an SAMC in an administrative decision that otherwise discusses the findings of said SAMC may also constitute harmless error. *See Mitchell v. Barnhart*, No. 03–1131, 2003 WL 1565467, at *1 (4th Cir. Mar.27, 2003) (per curiam) (unpublished opinion) ("Because the Commissioner's decision indicates that the opinion of the consultative physician was considered and provides reasons for the weight ac-

---

**11.** *See Richardson v. Perales*, 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend."); *Green v. Heckler*, 742 F.2d 237, 240 (5th Cir.1984) ("The Department of Health and Human Services processes millions of social security

claims each year."). In the fiscal year for 2002, the SSA processed 1.7 million disability insurance claims as well as another 1.7 million applications for supplemental security income and an additional 3.1 million claims for old age and survivors insurance. FAST FACTS & FIGURES ABOUT SOCIAL SECURITY 3 (June 2003), *available at* http://www.ssa.gov/policy/docs/chartbooks/fast_facts/2003/ff2003.pdf.

corded to that physician's report, we find no violation of SSR 96–6p."); *Mirza v. Barnhart*, No. 00 C 8003, 2003 WL 21058542, at *4 n. 3 (N.D.Ill. May 9, 2003) (unpublished opinion) (concluding "that the ALJ's failure to have discussed the state agency physician's report more fully does not lead to a finding that the Commissioner was not substantially justified on the facts here—even in light of SSR 96–6p."); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985) ("But as we pointed out . . ., this court does 'not require the ALJ to evaluate every piece of testimony and evidence submitted.' "). Indeed, even when an ALJ patently misreads a portion of the record, such misreading may be harmless if the record nonetheless supports the ALJ's decision with substantial evidence. *See Perez Torres v. Secretary of Health and Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989) (per curiam) ("Although the ALJ misread the record in stating that the claimant had never alleged a mental condition—the claimant alleged an emotional condition in August 1986, and again in his hearing request in February 1987—we have examined the entire record and find the error harmless.").

An examination of the record reveals that substantial evidence supports the ALJ's decision. None of the averred procedural or factual errors alleged by the Plaintiff regarding the findings of the Chappuis and Williams deprive the ALJ's ruling of substantial support when viewed in the context of the record as a whole. Indeed, Chappuis's and Williams's findings are downright unhelpful to Plaintiff's disability claim.[12] Therefore the ALJ's failure to expressly consider Chappuis's findings in her written decision is harmless. Likewise, to the extent that the ALJ's failure to specifically reference and/or discuss particular findings made by Williams in her written decision might constitute error, it is also harmless. *See Morris*, 864 F.2d at 336 ("We do not reach that question, because, even if such an impropriety exists, it does not render the ALJ's determination unsupported by substantial evidence, and thus does not prejudice [the claimant's] substantive rights.").

### K. Did the ALJ Commit Error By Disregarding the Testimony of the Vocational Expert?

██ Finally, Plaintiff argues that the testimony of vocational expert ("VE"), Jarold Hildre, supports an award of benefits. *Docket No. 29.* This contention is based on a series of hypothetical questions asked by the ALJ and answered by the VE. *Id.* This particular objection appears to be premised on the notion that the ALJ simply misinterpreted or misconstrued the VE's testimony. *See id.* Alternatively, Plaintiff may be asserting that the ALJ improperly discounted the VE's testimony. *See id.*

---

**12.** As previously discussed, Williams concluded that the Plaintiff was "within the average range of intellectual functioning," his speech was normal, his thought processes "were appropriate, coherent and goal-directed," his "concentration was good," found that the Plaintiff "is able to read the newspaper and understand radio/TV newscasts," and determined that the Plaintiff can successfully engage in everyday life activities. *Record* at 388–90. Chappuis decided that Plaintiff's claim that his condition stems from his 1985 brain abscess was "not generally credible" and instead concluded that Plaintiff's "symptoms improve when he stops alcohol." *Id.* at 220–21. Chappuis additionally found that the Plaintiff did not "meet the requirements for mental retardation" and identified Plaintiff's principal problem as being "alcohol abuse with intermittent marijuana." *Id.* at 221. Like Williams, Chappuis concluded that the Plaintiff "is able to carry out routine tasks." *Id.* at 206.

The Defendant responds by asserting that the VE's testimony is consistent with the decision issued by the ALJ. *Docket No. 31.* In particular, the Defendant appears to argue that, because the expert medical opinions did not support the existence of certain forms of physical and/or mental incapacity, certain hypothetical questions tied to those nonexistent conditions were irrelevant. *See id.* Accordingly, Defendant maintains that the VE's answers to said factually inapposite questions do not support an award of disability benefits and were properly discounted. *Id.*

The VE's testimony consists of answers to hypothetical questions propounded by the ALJ. *Record* at 52–55. The ALJ's questions were premised on the existence of certain facts. *See id.* Therefore, the VE's answers are supportive of the Plaintiff's disability claim solely to the extent that the factual predicate supplied by the ALJ turned out to be well-founded. As the ALJ found that the medical evidence did not, in fact supply the necessary predicate, and as the ALJ's conclusion is supported by substantial evidence, Plaintiff's asserted error has no merit. *See Bowling,* 36 F.3d at 436 (quoting *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir.1984), for the proposition that, "[u]nless there is record evidence to adequately support [assumptions made by a vocational expert], the opinion expressed by the vocational expert is meaningless"); *Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir.1985) (affirming ALJ's disregard of a vocational expert's testimony because the ALJ "found [that the] objective medical evidence did not coincide with the hypothetical assumptions posed to the vocational expert"); *Stubbs v. Mathews,* 544 F.2d 1251, 1256 (5th Cir. 1977) (finding that "the answers of the vocational expert given in response to hypothetical questions ... are not sufficient ... because of the inadequacy of the assumptions upon which they were based").

### L. *Conclusion*

Based upon the foregoing analysis, this Court finds that the Defendant's Motion for Summary Judgment is well founded and should be granted. The record, itself, could have been more complete and the ALJ could have written her opinion in a fashion which more closely follows the regulations. Nevertheless, while this Court has noted certain portions of the ALJ's Opinion that merit improvement, this Court also finds that, given the record as whole, the errors committed by the ALJ were harmless. Therefore, this Court **DENIES** the Plaintiff's Motion for Summary Judgment and **GRANTS** the Defendant's Motion for Summary Judgment.