**Robert FISHER, Plaintiff–Appellant,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant–Appellee.**

No. 88–1941.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1989.

Decided Feb. 24, 1989.

Daniel Galatzer, Chicago, Ill., for plaintiff-appellant.

Donna L. Calvert, Asst. Reg. Counsel, Dept. of Health and Human Services, Chicago, Ill., for defendant-appellee.

Before POSNER, FLAUM, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

The Social Security Administration denied Robert Fisher's application for disability benefits and the district court upheld the denial. A person whose IQ is between 60 and 69 is deemed to be totally disabled, regardless of his ability to do whatever work he has done in the past, if in addition to the low IQ he has "a physical or other mental [other than the low IQ, that is] impairment imposing additional and significant work-related limitation of function." 29 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(c); cf. *Nelson v. Bowen*, 855 F.2d 503, 504 n. 2 (7th Cir.1988). Fisher's IQ has been found to be 62; the dispute is over whether he has another impairment—either alcoholism or psychosis—which imposes an "additional and significant work-related limitation of function." The administrative law judge thought not, and went on to ask whether Fisher retains the capacity to perform his last job, which was as a janitor, and concluded that he did. This conclusion is not contested, so Fisher must persuade us that the finding that he does not have another impairment which imposes an "additional and significant work-related limitation of function" is unsupported.

Robert Fisher was 30 at the time of his hearing before the administrative law judge. He was the eighth of eleven siblings, only six of whom are still living; two were murdered. One of his siblings is in prison for attempted murder. At the age of nine Fisher saw a person killed. Fisher's father picked on Fisher, and it was Fisher who years later discovered his father's body when the father died. Not surprisingly in view of his low IQ, Fisher was a slow student, although he did

not drop out of high school until the eleventh grade. He married at the age of 17, but the marriage soon broke up, although not before he had a son, who visits him occasionally. Fisher has not worked since being fired from his janitorial job more than a decade ago for having alcohol on his breath. He lives with his mother, and helps her a bit about the house, but for the most part lives an idle and, by his own admission, an aimless life. He has no car, and socializes little. Although he has a girl friend he sees her only intermittently. He watches television (but not the news, because it makes him sad), listens to popular music, and reads comic books, as well as the newspaper comics and horoscope. He sleeps a great deal. He does some panhandling, and some shoplifting for which he is occasionally arrested. But he has never been in serious criminal trouble and he is polite, clean, well-dressed—even (at least at his interviews with the psychologists in the case) stylish. He drinks beer almost every day—about a quart but sometimes as much as 48 ounces (one and a half quarts). He testified that drinking 48 ounces does not make him drunk, although occasionally he is high. He used to drink cheap wine by the quart—enough to make him sick, which drove him to spend several days at a detoxification center. But by the time of the hearing, his drinking was, by his own testimony, under control. A psychologist who examined Fisher in 1984, two years before the hearing, said in his report, "He appears to live to drink," but it appears that Fisher's drinking problem was much less serious at the time of his disability hearing (1986) than it had been two years earlier. Neither of the other psychological reports submitted at the hearing indicates a current drinking problem, and the administrative law judge was entitled to conclude that the problem, if any, did not impose an additional *significant* limitation on Fisher's ability to work.

Dr. Snyder, a clinical psychologist retained by Fisher in connection with the application for disability benefits, opined that "Fisher does display quite severe and significant pathology at the present time. He displays psychotic thought replete with hallucinatory, delusional and major affective symptoms as well as a heightened state of anxiety." This conclusion is based on the following passage in Snyder's report. "When asked about any hallucinatory or delusional phenomenon he states he sometimes hears a voice call his name ... [and ask] 'What is you doing?' He claims there is a strange voice in my ear over and over. When asked how does it make you feel he states 'like in hell, like I'm paying for something someone else done, like haunted, like I'm not supposed to live to be this age.' When asked if he had ever seen something that may not have been there he stated that once on the way home from a movie he had talked to someone, turned away briefly and turned back to find out that he had disappeared.... When asked about feelings of persecution, he states that with some people they figure I know something I don't really, I feel strange around them so I leave. He claims to have felt this way since he was little, 'like a force always messing with me.' He states that he has always had problems and once ran down the street in his pajamas."

The Social Security Administration retained a psychiatrist, Dr. Ang, to advise it on Fisher's mental state. Her evaluation differed from Dr. Snyder's. Ang said Fisher "denies any history of perceptual disturbances or disturbances in content or form of thought.... His general attitude toward the examination was cordial and polite. He fell asleep a couple of times. His affect reflected no anxiety, sadness or flatness." His answers to questions designed to test his intelligence led her to estimate his intelligence "in the average range." Yet when asked to name five states, he named America, Russia, and England; and he interpreted the proverb "People in glass houses should not throw stones" to mean "they will break the window." Ang said that Fisher's attention span and short-term memory were poor, and remarked without elaboration that he had fallen asleep twice during the interview. She recited, also without elaboration, a list of 12 drugs that Fisher takes. Four of these are antihistamines (the others are vitamins, mild pain-

killers, and blood-pressure medicines), and he may have been sleepy from taking too many of them, but this angle was not explored. In a social security disability form appended to her report Dr. Ang evaluated Fisher's ability to do work-related activities on a day-to-day basis as "fair"—which however the form defines as "ability to function in this area is seriously limited, but not precluded." The administrative law judge gave more weight to Dr. Ang's report than to Dr. Snyder's because Ang is a Board-certified psychiatrist and Snyder a psychologist, and concluded that Fisher had only "slight limitations in terms of daily living and social functioning, less than frequent deficiencies of concentration, and only occasional episodes of deterioration or decompensation which would not preclude the claimant from performing simple, repetitive work activity."

Fisher's counsel emphasizes the tensions in Dr. Ang's report. That Fisher should have fallen asleep twice during the interview seems remarkable, but drew no comment from Dr. Ang, although as we have said medication is the obvious explanation and one irrelevant to Fisher's mental problems. Ang's estimation that Fisher is of average intelligence is difficult to reconcile with his IQ score. However, IQ tests, especially when administered to adults, are far from infallible; and Fisher's answers to Ang's questions, while not bright, do not appear to demonstrate substantial mental retardation. America, Russia, and England are (nation) states, after all, and the "glass houses" proverb means approximately what he said. Nothing in the report itself supports the conclusion on the appended form that Fisher's ability to function in the workplace is "seriously limited," which suggests that Ang may have misunderstood the form. The administrative law judge did not remark any of these anomalies. Nor did he explain why a psychiatrist's evaluation is to be preferred to that of a clinical psychologist—a turf issue upon which we are disinclined to venture. See *Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337 (7th Cir.1987). So the administrative law judge's opinion is vulnerable. But that is nothing new. See *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985).

No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result. *Illinois v. ICC*, 722 F.2d 1341, 1349 (7th Cir.1983); *Busboom Grain Co. v. ICC*, 856 F.2d 790, 796 (7th Cir.1988); *Erie–Lackawanna R.R. v. United States*, 279 F.Supp. 316, 354–55 (S.D.N.Y.1967), aff'd with modifications, and remanded, under the name *Penn–Central & N.W. Inclusion Cases*, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968) (Friendly, J.).

Apart from Dr. Snyder's report of hallucinations there is very little to suggest that Fisher is less able to work than other people of low IQ. Indeed, there is very little to suggest that low IQ poses any sort of obstacle to unskilled labor of the sort Fisher used to do. The transcript of the disability hearing makes plain that he is not "moronic," at least in anything like the popular sense of the term. His low IQ may reflect more on IQ testing than on Robert Fisher, although for purposes of our review we accept that he indeed has an IQ of only 62. (None of his IQ tests is in the record.) He has trouble with abstraction, to be sure, and his memory is not distinguished, but in ordinary conversation, even in the rather forbidding setting of an official hearing, he gives no sign of anything so ominous-sounding as "retardation." His falling asleep during the interview with Dr. Ang is surprising, but there is no other indication of narcolepsy; and perhaps Dr. Ang rather overdid the soothing manner of the professional therapist, but it is more likely that Fisher simply over did the antihistamines.

We are speculating, of course; but all that Fisher can point to in the record to demonstrate a mental impairment that places a significant limitation on his ability to work as a janitor is the hallucinations that he reported to Dr. Snyder. We quoted the passage from which Dr. Snyder drew his alarming inference of mental disease. The passage is consistent with profound mental disturbance but does not prove it. Many—probably most—Americans would if questioned report "psychic" experiences. Opinion polls show that a majority of

**1058**

Americans believe in magic and the occult, but a majority of Americans are not psychotic. The administrative law judge was not required to find that Fisher is.

Fisher's drinking problem is apparently under control. He is by the report of the specialists who examined him personable and pleasant. He is not highly intelligent, but he is intelligent enough to do many jobs in the economy. He should not be encouraged in dependency. He should not be condemned to a life of moping around his mother's house. The decision of the administrative law judge that Fisher is not totally disabled was supported by substantial evidence, and is therefore

AFFIRMED.