# In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2274

MARY FLENER, on behalf of RAY FLENER, a minor,

*Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 4152—**Michael J. Reagan**, *Judge.*

_____

SUBMITTED JANUARY 27, 2004[*]—DECIDED MARCH 19, 2004

_____

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

PER CURIAM. Ray Flener, who applied for Supplemental Security Income ("SSI") in 1997 at the age of nine, appeals from the denial of his application for benefits. The administrative law judge ("ALJ") determined that Ray had oppo-

---

[*] This appeal was submitted on the briefs and the record after we granted the appellant's motion to waive oral argument. *See* Fed. R. App. P. 34(f); Cir. R. 34(e).

sitional defiant disorder and an unnamed learning disabil-
ity, but that these impairments neither constitute, nor
functionally equal, a listed impairment. Ray argues that the
ALJ's decision is not supported by substantial evidence and
that the ALJ erred by failing to use a medical expert to
interpret the results of two psychological tests. We affirm.

## I. History

We draw the facts from the evidence admitted at the April
1998 hearing on Ray's application for benefits. Since he was
a small child, Ray has exhibited difficulty controlling his
anger and behaving appropriately. Early on doctors diag-
nosed him with Attention Deficit Disorder ("ADD") and
Attention Deficit Hyperactivity Disorder ("ADHD"). In April
1995, when Ray was six years old and in kindergarten, a
human services therapist certified in mental health care
diagnosed Ray with oppositional defiant disorder, which the
American Psychiatric Association defines as "a recurrent
pattern of negativistic, defiant, disobedient, and hostile
behavior toward authority figures that persists for at least
6 months." American Psychiatric Association, *Diagnostic
and Statistical Manual of Mental Disorders* § 313.81 (4th
ed. 1994). The therapist noted that Ray was "very defiant,
[threw] temper tantrums, [and became] very angry very
quickly." She ranked him as "poor" in the areas of socializa-
tion skills, leisure activities, interpersonal relationships,
and age-appropriate independence of function. Ultimately,
however, she characterized his prognosis as "fair."

Beginning in 1995 Ray and his mother visited a family
practice physician, Dr. Jeffrey Parks, once or twice a month.
The subject of Ray's behavioral problems was occasionally
discussed. Parks recommended that Ray "continue" taking
Ritalin and visiting a counselor, although the record does
not reflect how long Ray had been doing these things. Parks
also referred Ray to a pediatric neurologist, but here again

the record does not disclose whether Ray followed up on that referral. In his notes from a visit later that year, Parks memorialized a conversation with an unnamed counselor in which they discussed Ray's ongoing psychotherapy and use of Ritalin and agreed he was "doing well."

In October 1995, when Ray started first grade, he was placed in special education classes. The school psychologist tested Ray and opined that he had a preoccupation with violence and seemed to have "difficulty distinguishing his fantasies from reality." She further noted that Ray had difficulty working in large groups and required repeated instruction. Based on the Kaufman Test of Educational Achievement, which measures a child's abilities compared to others of his grade level, the psychologist determined that Ray's scores were below average in reading, but above average in spelling and math.

Ray continued to take special education classes, and in October 1996 the school reevaluated his progress. Ray's teacher and his mother both answered a series of written questions comprising the Behavior Assessment System for Children ("BASC"), in which they assessed the frequency with which Ray engaged in inappropriate behaviors like making threats, playing with fire, and throwing tantrums. The school social worker then analyzed these answers using BASC computer software and opined that Ray had problems with hyperactivity, aggression, depression, attention, study skills, and adaptability. She noted that the results from both the teacher and parent rating scales identified "extreme" behaviors on Ray's part, but she cautioned that the results might be suspect because internally inconsistent answers to some of the test questions showed that Ray's teacher may have been "excessively negative in describing the child's behaviors."

At that same time, the school social worker also administered the Vineland Adaptive Behavior Scale, which

takes the form of a survey, to Ray's mother. The test included questions about Ray's ability to function socially and cope with the challenges of daily living. The social worker scored Mrs. Flener's responses according to the instructions contained in the test and calculated Ray's standardized scores, which he compared to the norms for children of Ray's age. The social worker opined that, although Ray's chronological age was eight years, four months, his communication level was five years, ten months, his daily living skills level was five years, nine months, and his socialization level was two years, six months. The social worker believed that Ray's maladaptive behavior level was significant.

Ray continued to visit Dr. Parks, who noted for the first time in November 1996 that Ray had been taken off Ritalin by his father the previous May. Parks spoke with Mrs. Flener, who reported that Ray had had a number of recent behavioral problems at school. Parks personally observed that Ray had a short attention span and could not sit still, although he was not verbally or physically aggressive during the exam. He attributed Ray's behavior to ADD and recommended a psychiatric referral.

The school social worker also recommended that Ray undergo a psychiatric evaluation and in December 1996 referred him to Tammy Bowles, a certified art therapist and mental health care provider at St. Elizabeth Medical Center. Bowles reported that Ray had a history of displaying aggression and threatening to hurt himself, as well as a fascination with fire. During her interview with Ray, Bowles judged him to be "extremely impulsive" but still "very engageable" and anxious to please others. She noted that Mrs. Flener seemed "extremely concerned" about Ray's poor judgment. Ultimately, Bowles characterized Ray as needing "some help" with socialization, and recommended that he see an adolescent psychiatrist and engage in play or art therapy.

Beginning in April 1997 Ray attended several counseling sessions with Constance J. Close, a certified mental health care practitioner with a background in school psychology. She talked with Ray about handling his anger and behaving appropriately. They made a list of things Ray could work on to improve himself, and she concluded that Ray was "willing to try." However, Close noted that Ray continued to behave inappropriately throughout their sessions.

In June 1997 Mrs. Flener filed an application for SSI on Ray's behalf, alleging that he was disabled due to scoliosis, a learning disorder, and a behavior disorder. The Social Security Administration ("SSA") denied the application initially and upon reconsideration. Ray petitioned for de novo review by an ALJ.

Ray was examined in August 1997 by Dr. Ramesh M. Patel, a family practitioner whose evaluation was apparently requested by the SSA in anticipation of the upcoming hearing before the ALJ. Patel observed that Mrs. Flener was very concerned about Ray's trouble in school and tendency to lie and argue. Patel reported that Ray told him he earned "B grades" in his third-grade special education classes and enjoyed biking, fishing, and playing video games. Patel also noted, but did not discuss, Ray's history of attention deficit and behavior disorder.

Later that month the Illinois Bureau of Disability Determination Services ("state agency") requested that Ray be examined by Dr. James W. Whisenhunt, a clinical psychologist. Whisenhunt reviewed Ray's records, including the BASC and Vineland tests, and examined him for two and one-half hours. Whisenhunt began with a summary of Ray's record—he was in special education classes, where teachers reported he engaged in attention-getting, aggressive behavior such as using obscenities, making threats, and fighting. Ray's teachers and mother stated that his behavior was difficult to control, and that he often acted impulsively

and vindictively. Occasionally, he even threatened to kill himself. Whisenhunt then administered an IQ test and determined that Ray's scores were in the low end of the average range. He concluded that Ray's range of factual information, his comprehension, his verbal conceptual abilities and expression of concepts, his sequencing, and his speed of learning by association all fell less than one standard deviation below the average. Ray's skills with vocabulary, arithmetic, discriminating objects, focusing on details, and understanding spatial relations of abstract figures were all between one and two standard deviations below average. Based on his testing and observations, Whisenhunt concluded that Ray suffered from oppositional defiant disorder of moderate severity and "a non specified learning disability associated with attention deficit problems." He also identified the possibility that Ray suffered from depression and recommended medication and counseling. Overall, Whisenhunt believed that Ray's abilities fell in the low end of the average range.

State agency psychologist Dr. M. A. Wharton and state agency physician Dr. Julio Pardo also reviewed Ray's full medical and school records in August 1997, although they apparently did not personally examine or interview him. They opined that Ray suffered from a severe impairment, i.e., oppositional defiant disorder, but that it did not meet, or medically or functionally equal, a listed impairment. Employing the terminology used by the social security regulations, they opined that Ray had "less than marked" limitations in the areas of cognitive/communicative functioning, motor skills, and concentration, meaning the limitations did not "interfere seriously" with his functioning. They also found that he had a marked limitation in social functioning. Although the doctors read Ray's records to show that he had problems with behavior and attention, they opined that his behavior disorder was of only moderate severity.

In October 1997, approximately six months before the hearing on Ray's application for benefits, the state agency sent Ray's then-current teacher, Lisa Studacher, a school activities questionnaire. She reported that she had not noticed any problems with Ray's ability to work with others, pay attention, work independently, or act appropriately. Although she believed that he became frustrated easily and could not keep up with his peers in sports and games, she did not observe any problems with Ray's ability to complete assignments or adapt to change.

Also in October 1997, Dr. Wharton and state agency physician Dr. B. Rock Oh again reviewed Ray's complete file. They opined that Ray had a severe impairment, but that it did not meet or medically or functionally equal a listed impairment. In their opinion, again using the terminology of the social security regulations, Ray's record demonstrated a less than marked limitation in the area of "concentration, persistence, or pace" and a marked limitation in social functioning. They found no evidence of any other kind of limitation.

Ray's special education teacher and the school social worker reviewed his academic progress and educational plan in February 1998. Ray's teacher had administered the PIAT test of written expression to him, and his scores showed improvement in the areas of spelling, math, phonics, and general information. These scores met many of the goals Ray's teacher had set out for him. However, he was not working at grade level, and his teacher noted that he still had "trouble dealing with anger, getting along with classmates and following orders."

Ray's hearing before the ALJ was in April 1998, and he was represented by counsel. All of the medical and academic records discussed to this point were received into evidence without objection. Ray testified that he was in special education class, where he sometimes got in trouble

for misbehaving, but "not too often." He said that he did not want to do his work and got into fights about once a week, although he "usually" got along with his classmates. Mrs. Flener, the only other live witness besides Ray, testified that Ray had "flunked three times" and that he suffered from ADHD, but was not currently taking any medication for it. She said Ray's oppositional defiant disorder made it difficult for him to understand boundaries and pay attention to instructions. She testified that Ray had thrown a cat at a tree and made threats to other students, and that he had symptoms of depression, including nightmares and thoughts of suicide. Counsel waived opening and closing statements.

In June 1998 the ALJ issued a written decision denying Ray SSI, reasoning that his impairments did not meet, or medically or functionally equal, the requirements of a listed impairment. The ALJ found that Ray had no limitation in motor functioning and a less than marked limitation in the areas of cognitive/communicative functioning, personal hygiene, and concentration, persistence or pace. He found Ray to have a marked limitation in social functioning. In reaching this conclusion, the ALJ relied on Dr. Whisenhunt's opinion that Ray's abilities were in the average range. He noted that, although Ray's academic performance was deficient and he got into fights, Ray had not been suspended from school, and his current teacher had discerned "no problems" with his behavior other than a tendency to become quickly frustrated. Further, he pointed out that Ray did not take medication for his oppositional defiant disorder, although it had been recommended. The ALJ reviewed the "entire medical record" and found no evidence of "severe" limitations in Ray's functioning. Because the Appeals Council denied Ray's request for review, the ALJ's decision stands as the final decision of the Commissioner.

Ray filed a timely complaint in the district court seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The action was referred to a magistrate judge. Ray filed a memorandum arguing that the ALJ's decision is not supported by substantial evidence, and that the ALJ should have called a medical expert to analyze the results of the BASC and Vineland tests administered by the school's social worker to Ray's teacher and mother in 1996. The magistrate judge recommended that the decision be reversed, addressing only the need for a medical expert at the hearing. He noted that social security regulations contained language that "strongly suggested" that the ALJ should have obtained standard deviations, and that a medical expert might have found significant the deviations in the BASC scores for externalizing problems, aggression, and conduct problems. The Commissioner objected to the magistrate judge's recommendation, arguing that the BASC and Vineland scores for which Ray sought expert analysis were too old to be relevant to his application for benefits, and that, regardless, they were not reliable "standardized tests" within the meaning of the social security regulations because they were not administered by a psychologist or physician, but rather by a social worker. The district court agreed that the Vineland and BASC scores were not "appropriate primary evidence of Ray's disability," and accordingly affirmed the decision of the ALJ.

## II. Analysis

Under the rules in effect at the time of Ray's application, a child could be eligible for SSI on the basis of disability if he could show (1) that he was not working; (2) that he had a "severe" impairment or combination of impairments; and (3) that his impairment or combination of impairments met, medically equaled, or functionally equaled the severity of one of the specifically listed impairments. *See* 20 C.F.R.

§ 416.924 (2000). A claimant's impairments would be deemed functionally equivalent to a listed impairment if they resulted in an extreme limitation of function in one broad area of functioning or marked limitations of function in two broad areas. 20 C.F.R. § 416.926a(b)(2) (2000). In this case Ray's challenge appears to be to the ALJ's determination that his behavioral disorders caused only a marked, rather than an extreme, limitation on his social function. A claimant's social function is his

> ability or inability to play alone, with another child, and in a group; to initiate and develop friendships; to respond to . . . social environments through appropriate and increasingly complex interpersonal behaviors, such as empathizing with others and tolerating differences; and to relate appropriately to individuals and in group situations.

20 C.F.R. § 416.926a(c)(5)(iv)(C) (2000). A "marked" limitation is "more than moderate and less than extreme," and can arise due to a limitation or combination of limitations that "interfere[s] seriously with the child's functioning." 20 C.F.R. § 416.926a(c)(3)(i)(C) (2000). An "extreme" limitation occurs when there is "no meaningful functioning in a given area." 20 C.F.R. § 416.926a(c)(3)(ii)(C) (2000).

Ray initially contends that the ALJ's determination that he did not have an extreme limitation on his social function is not supported by substantial evidence. Substantial evidence is evidence that is sufficient for a reasonable person to accept as adequate to support the decision. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). To determine if substantial evidence exists, we review the record as a whole but do not substitute our judgment for that of the ALJ by reweighing facts or witness credibility. *Id.*

We conclude that substantial evidence supports the ALJ's determination that Ray had a marked, but not extreme, limitation on his social functioning. Dr. Whisenhunt, a state

agency psychologist, and two state agency physicians reviewed Ray's complete medical and educational records and opined that, although Ray had problems with behavior and attention, his ability to interact socially was not completely impaired. They concluded, as the ALJ did, that Ray was not disabled within the meaning of the guidelines. It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation. 20 C.F.R. § 416.927(f)(2)(I) (2000). The fact that these physicians reviewed the entire record strengthens the weight of their conclusions. *Hudson v. Barnhart*, 345 F.3d 661, 667 (8th Cir. 2003). The ALJ's finding is also supported by the observations of Ray's most recent teacher, who stated that she had not noticed any problems with his ability to interact with others. Teachers and parents who observe a child's behavior may provide substantial evidence of a mental disorder, or the lack thereof. 20 C.F.R. § 416.913(e); *see Pepper v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003). The testimony of Ray and his mother—that Ray had difficulties socially and often acted out, but had some friends and performed satisfactorily within his special education program—also supports the ALJ's conclusion. Because the ALJ analyzed the correct criteria and relied on appropriate medical evidence, a reasonable person could accept his decision as adequate. *See Sims v. Barnhart*, 309 F.3d 424, 430 (7th Cir. 2002).

Ray also argues that the ALJ erred when he failed to independently recruit a medical expert to calculate the standard deviations on the scores from the Vineland and BASC tests. The magistrate judge apparently calculated the standard deviations himself and stated that the scores in some categories on the BASC were more than three standard deviations below the norm, which might have been evidence of an "extreme" limitation. 20 C.F.R. § 416.926a(c)(3)(ii)(A) (2000). It is unclear, however, if Ray's argument is that the ALJ's purported omission was proce-

dural (in failing to develop the standard deviation evidence) or substantive (in failing to give the proper weight to these tests). Either way, his argument is unavailing.

An ALJ does have a duty to develop a claimant's medical record, and thus may be required to consult medical advisors where that record appears to be incomplete. 20 C.F.R. § 416.912(d) (2000); *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). However, the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant. 20 C.F.R. § 416.912(c) (2000). Further, we have recognized that, because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).

The ALJ in this case followed the proper procedure and developed the record adequately. The record included not only the raw tests scores Ray now claims were not appropriately developed, but also the reports of Ray's treating physician, several other consulting physicians, Ray's counselors and social workers, and his past and present teachers. Moreover, two state agency physicians and a state agency psychologist reviewed Ray's complete medical records, including the tests he claims required further development, and concluded that Ray was not disabled within the meaning of the regulations. Dr. Whisenhunt reached a similar conclusion on his review of the complete record. Given all the current, reliable medical evidence in the record, the ALJ could conclude that further development of Ray's BASC and Vineland scores was not necessary. *Hudson*, 345 F.3d at 667; *Dotson v. Peabody Coal Co.*, 846 F.2d 1134, 1139 (7th Cir. 1988) ("an ALJ may permissibly accord greatest weight to the most recent medical evidence"). The ALJ had a "fairly complete picture" of Ray's condition, and the failure to obtain standard deviations on

the BASC and Vineland scores was certainly not a significant, prejudicial omission of the type compelling reversal. *See Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997).

More importantly, Ray makes too much of language in the current SSA regulations stating that an ALJ "will consider" scores from "standardized tests" along with their standard deviations. *See* 20 C.F.R. § 416.926a(e)(ii) (2001). Ray apparently contends that the ALJ should have given dispositive weight to standard deviations from the BASC and Vineland tests, but the language he cites was added after his hearing; the version relevant here mentioned standardized test scores as a potentially useful tool, but contained no mandatory language. 20 C.F.R. § 416.926a (c)(3)(ii)(A) (2000). And in any event the regulations define "standardized tests" as those administered by a "psychologist, psychiatrist, pediatrician, or other physician specialist qualified by training and experience to perform such an evaluation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D (2000). Because the tests in this case were administered by a social worker, they are not "standardized," and the ALJ would not have a duty to give them the weight Ray suggests even under the regulations he cites. In fact, the BASC results Ray claims deserved more weight contained a warning that they should be interpreted "with caution" because the teacher evaluating Ray evidenced signs of excessive negativity. We believe the ALJ gave these tests adequate weight, fully in keeping with his duty to consider all "medical evidence that is credible, supported by clinical findings, and relevant to the question at hand." *Nelson*, 131 F.3d at 1237.

## III. Conclusion

Because the ALJ properly developed the record and rendered a decision that is supported by substantial evidence,

the district court did not err in upholding his determination that Ray was not entitled to social security benefits. Accordingly, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*