**Daniel BUCHHOLTZ, Plaintiff–
Appellant,**

**v.**

**Jo Anne B. BARNHART, Commis-
sioner of Social Security, De-
fendant–Appellee.**

No. 03–3235.

United States Court of Appeals,
Seventh Circuit.

Argued April 20, 2004.

Decided May 12, 2004.

Frederick J. Daley, Marcie E. Gold-bloom, Daley, Debofsky & Bryant, Chicago, IL, for Plaintiff–Appellant.

Richard D. Humphrey, Office of The United States Attorney, Madison, WI, Anne Lipnitz, Social Security Administration, Office of the General Counsel, Chicago, IL, for Defendant–Appellee.

Before EASTERBROOK, EVANS, and WILLIAMS, Circuit Judges.

**ORDER**

Daniel Buchholtz applied for Disability Insurance Benefits and Supplemental Security Income, claiming that he was disabled due to ongoing pain from a back injury. After a hearing, an administrative law judge (ALJ) denied Buchholtz's claim and the Appeals Council declined review, making the ALJ's decision the final decision of the Commissioner of Social Security. The district court upheld that decision, and we affirm.

Buchholtz's disability claim stems from an injury to his back that he incurred while helping his aunt move furniture on September 27, 1998. At the time of the injury, Buchholtz, then forty-five years old, had been doing part-time carpentry work after losing his construction job three years earlier. His income since his injury has consisted of food stamps, and at the time of his hearing before the ALJ he was living in an apartment that his friend owns.

Buchholtz's injury caused him pain in his lower back that radiated down his right leg with some numbness and tingling in the heel. After chiropractic treatment and two epidural steroid injections failed to provide sustained relief, Buchholtz in December 1998 had an MRI, which established a loss of nerve signal intensity at the L4–5 vertebrae and a herniated disc to the right side of that vertebrae that was compressing the L5 nerve root. His nerve connections, however, were normal according to an EKG. Based on these results, Dr. Thomas, an orthopedist, recommended a laminotomy and diskectomy.

Buchholtz initially responded well to the surgery but several weeks later again experienced pain similar to his pre-surgery condition. A second MRI revealed that a recurrent herniated disc in the same loca-

tion was causing spinal stenosis–a narrowing of the spinal canal that can compress and irritate nerve roots branching out from the spinal cord. This discovery led to a second laminotomy and diskectomy. During December and January, Buchholtz also took several pain medications, including morphine, Decadron, Vicodin, and Pepcid.

At follow-up exams Buchholtz reported gradual improvement in his pain levels. But after hearing a "pop" when he bent down to pick up a nail one day in May 1999, the pain returned. A third MRI in July 1999 ruled out another herniation but disclosed that Buchholtz had multi-level degenerative disc disease and some epidural fibrosis. Dr. Thomas believed the pain to be "more of an acute flare up," prescribing a Medrol dosepak and referring him to physical therapy.

After achieving initial success with physical therapy and reporting gradual improvement, Buchholtz stopped attending sessions during the third week because, he told Dr. Thomas, the therapy began to aggravate his back. After a July 1999 appointment, Dr. Thomas noted in his file without comment that Buchholtz had stopped attending physical therapy but during a later appointment recommended that Buchholtz continue doing the exercises given to him by the physical therapist. And although Dr. Thomas reiterated to Buchholtz at an appointment in July 1999 that epidural steroid injections would help alleviate his pain, Buchholtz refused such treatment, citing the expense and its ineffectiveness pre-surgery.

Over the next two years, Buchholtz visited Dr. Thomas three more times on an as-needed basis. Dr. Thomas concluded that Buchholtz's pain stemmed from degenerative disc disease with some radiculopathy related to scarring within the nerve but detected no signs of root tension or evidence of weakness. Believing nothing more could be done surgically, Dr. Thomas during these visits continued to recommend medication, rest, and exercise. Buchholtz, however, did not take any pain medication and rarely exercised, occasionally walking around when his pain level decreased.

In October 2001, several months after his third visit during which Buchholtz told Dr. Thomas he was seeking disability benefits, Dr. Thomas referred Buchholtz to a physical therapy center to undergo a functional capacity evaluation. During that evaluation Buchholtz described suffering from back pain and numbness in his right leg that increased when he sat or stood for more than twenty minutes. Buchholtz explained that he was unable to sleep more than three hours and could no longer hunt or fish, although he still did household chores. Physical testing revealed that Buchholtz could perform sedentary work that would accommodate his difficulty stooping, kneeling, and crouching, and his need to alternate between sitting and standing on a frequent basis. Three weeks later, Dr. Thomas endorsed this conclusion, stating that these limitations existed before December 2000.

At a hearing on Buchholtz's application in November 2001, the ALJ requested without objection that Dr. Mulhausen, a specialist in internal medicine, testify as an expert. After examining the medical record, Dr. Mulhausen opined that Buchholtz suffered from degenerative disc disease of the lower spine. Dr. Mulhausen concluded that Buchholtz could perform sedentary work with an option to shift between sitting and standing every twenty to twenty-five minutes. Although noting that Buchholtz could occasionally climb, balance, kneel, and crouch, Dr. Mulhausen advised that Buchholtz should not do work involv-

ing significant stooping, reaching above the shoulder, or use of heavy machinery.

Buchholtz testified at the hearing that he could sit or stand continuously for thirty to forty-five minutes before having to change positions, but was unable to work because he suffered unpredictable "spells," often while sitting, that required him to walk or stand for a while. He could occasionally bend, squat, and climb stairs but could not reach above his shoulders. At times, Buchholtz testified, he could not get out of bed. Buchholtz's daily activities consisted of watching television and occasionally accompanying friends as a passenger on short drives. Although Buchholtz cooked and cleaned, his mother did his laundry. When grocery shopping Buchholtz carried no more than a half-gallon of milk and some bread and meat the block and a half to his apartment. Buchholtz testified that he was still experiencing constant pain in his lower back and right leg (with numbness in his right toe) but had not returned to see Dr. Thomas because the doctor had told him that nothing more could be done for his pain. Buchholtz said he did not take any pain medication because it was too expensive and not effective.

A vocational expert (VE) also testified at the hearing after reviewing the record and listening to both Dr. Mulhausen and Buchholtz testify. The ALJ posed to the VE a hypothetical question incorporating restrictions recommended by Dr. Mulhaussen—performing simple and unskilled or semi-skilled work, including lifting up to ten pounds, sitting for six out of eight hours with a sit/stand option every twenty to twenty-five minutes, occasionally climbing stairs, infrequently stooping, kneeling, crouching, and crawling, but not using foot pedals or reaching above the shoulders, exposing himself to unprotected heights, or using heavy machinery—and asked whether such an individual could perform Buchholtz's past relevant work. After the VE responded negatively, the ALJ asked if there were any jobs in the economy that such an individual could perform. The VE testified that there were approximately 22,000 jobs in the regional economy, including work as a factory laborer, a hand packer, or assembly worker (of small parts like microphones). Buchholtz's attorney asked about an individual who could sit for a maximum of four hours and then stand or walk around for the other four hours, and the VE confirmed that the same jobs would still apply because an individual could alternate as needed between sitting and standing.

Following the five sequential steps laid out in 20 C.F.R. § 404.1520(a)-(f), the ALJ first found Buchholtz's degenerative disc disease to be a severe impairment, but not one reaching the listing requirements. The ALJ adopted Dr. Mulhausen's recommended restrictions and the VE's testimony in finding that Buchholtz could not do his former work in construction but could still perform a significant number of jobs as a hand packer, factory laborer and assembly worker. The ALJ also found that Buchholtz's testimony that he was unable to work lacked credibility because, among other reasons, the neurological findings did not show severe deficits consistent with disabling pain, Buchholtz had not followed the prescribed course of treatment, and he engaged in a "full range" of daily activities.

An earlier application for disability benefits, submitted by Buchholtz with the same onset date, had been denied without appeal. But because the ALJ did not apply res judicata to bar Buchholz's subsequent application, *see Johnson v. Sullivan,* 936 F.2d 974, 976 (7th Cir.1991) (decision to apply administrative res judicata is discretionary), we review Buchholtz's claim on the merits. *See Byam v. Barnhart,* 336

F.3d 172, 180 (2d Cir.2003) (if ALJ has considered second application on merits, first application deemed constructively reopened and res judicata is waived); *Kasey v. Sullivan,* 3 F.3d 75, 78 (4th Cir.1993) (same); *see also Johnson,* 936 F.2d at 976 (Commissioner is estopped from asserting res judicata if decision has been reopened or reconsidered on merits).

We will uphold the ALJ's decision so long as it is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003). Substantial evidence means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gudgel,* 345 F.3d at 470 (internal quotations and citation omitted). An ALJ must articulate, at least minimally, his analysis of the evidence so that we may follow his reasoning. *Johansen v. Barnhart,* 314 F.3d 283, 287 (7th Cir.2002).

■ On appeal Buchholtz first raises a host of arguments attacking the ALJ's adverse credibility determination. Of those challenges, his strongest argument is that the ALJ failed to follow the dictates of Social Security Ruling (SSR) 96–7p by ignoring objective medical evidence of nerve damage, specifically Dr. Thomas's diagnosis of some epidural fibrosis.

To succeed Buchholtz must overcome the highly deferential standard that we accord credibility determinations. Because the ALJ is best positioned to evaluate the credibility of a witness, we reverse an ALJ's credibility finding only if it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000) (internal quotations and citation omitted). But when questioning an applicant's credibility as to symptoms of pain, the ALJ must follow specific requirements set forth in SSR 96–7p. First, the ALJ decides whether the pain is substantiated by medical evidence. *See* SSR 96–7p at 2; *Lopez ex rel. Lopez v.*

*Barnhart,* 336 F.3d 535, 539 (7th Cir.2003). If the pain is not supported by objective medical evidence, the ALJ evaluates the effects of the complained-of pain on the individual's functional ability to work, taking into account the claimant's daily activities; his past work history and efforts to work; the dosage, effectiveness, and side effects of medication; the nature and intensity of the reported pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment. SSR 96–7p at 3, 5; *see Scheck v. Barnhart,* 357 F.3d 697, 703 (7th Cir.2004); *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994).

Here, although the ALJ did not mention epidural fibrosis by name, his finding did not ignore neurological evidence. Rather, the ALJ reasoned that there were no neurological findings establishing that Buchholtz experienced *severe* ¨deficits. The ALJ must articulate his reasons for accepting or rejecting entire lines of evidence, but we do not require a written evaluation of each piece of evidence. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Furthermore, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir.1989); *see Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000) ("[W]e give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it." (internal quotations and citation omitted)). And evidence from the record does support the ALJ's conclusion, so we cannot conclude that a remand would lead to any different outcome. Dr. Thomas's diagnosis that the pain came mostly from degenerative disc disease with only some epidural fibrosis is consistent with the ALJ's findings that Buchholtz did not have se-

vere deficits likely to produce disabling pain. Moreover, the ALJ's assessment of Buchholtz's residual functional capacity was at least as restrictive, if not more so than all of the evidence about Buchholtz's limitations except Buchholtz's own statements at the hearing. Indeed the functional capacity test endorsed by Dr. Thomas mirrors the ALJ's finding.

■ Continuing his challenge to the ALJ's credibility determination, Buchholtz contends that the ALJ improperly relied on his spotty work history and financial support from friends to conclude that he lacked incentive to return to work. As Buchholtz points out, the ALJ's assessment of Buchholtz's work history does not mention information from his application that, after losing his job because his employer went out of business, Buchholtz worked part-time doing construction work for cash until his injury. But Buchholtz's work history is still sparse even if these very general statements are believed, and the ALJ may discount his claimed disability on this basis, *see* SSR 96–7p at 5; *Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir.2001); *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998), even though all claimants perhaps are somewhat financially motivated, *O'Donnell v. Barnhart,* 318 F.3d 811, 817 (8th Cir.2003).

■ Buchholtz's next argument concerning the ALJ's credibility determination warrants some consideration, but ultimately fails as well. Buchholtz asserts that the ALJ ignored his explanations for not seeking certain medical treatment–that it was ineffective and too expensive–and questioned his failure to undergo procedures that no doctor had recommended. The ALJ's analysis, however, is largely correct save for one error. As Buchholtz argues, the ALJ improperly played doctor when he listed a host of possible treatments, including use of a TENS unit, bio-

feedback, additional surgery, a visit to a pain clinic, and continued physical therapy among others, that he believed Buchholtz would have pursued if his pain was disabling. Of the "omitted" treatments, Dr. Thomas recommended only one of them—physical therapy—and specifically advised against further surgery. *Lopez,* 336 F.3d at 540 (ALJ may not play doctor); *Godbey v. Apfel,* 238 F.3d 803, 809 (7th Cir.2000) (claimant not required to follow treatment that doctor believed would not improve condition).

But the ALJ properly analyzed Buchholtz's failure to follow the treatment Dr. Thomas did prescribe. Denying a claimant benefits based on his failure to follow prescribed treatments depends upon whether that treatment would have eliminated his total disability and whether he has a sufficient excuse. 20 C.F.R. § 404.1530(a); *Luna,* 22 F.3d at 691. Buchholtz personally judged the pain medication and epidural shots ineffective. But he drew that conclusion mostly from when his diagnosis was a herniated disc, not degenerative disc disease and acute back strain, and Dr. Thomas recommended both these treatments for the second set of problems. The ALJ could reasonably conclude that following his doctor's prescribed course of treatment would have restored Buchholtz's ability to work.

Buchholtz counters that he could not afford the medications and epidural shots or regular doctor's appointments, which other circuits and the social security regulations have upheld as a reason not to follow a prescribed course of treatment. *See* SSR 96–7p at 8; *Newell v. Comm'r of Soc. Sec.,* 347 F.3d 541, 547 (3d Cir.2003); *Ellison v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir.2003); *Shaw v. Chater,* 221 F.3d 126, 133 (2d Cir.2000); *Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir.1995); *see also Shramek,* 226 F.3d at 812 (good reason

may excuse failure to follow course of treatment). The ALJ, however, doubted Buchholtz's explanation based on lack of evidence that he was denied treatment because he could not afford it or that he had sought low-cost medical treatment. An absence of evidence that a claimant sought low-cost or free care may warrant discrediting his excuse that he could not afford treatment. *Osborne v. Barnhart,* 316 F.3d 809, 812 (8th Cir.2003). And although Buchholtz argues that the ALJ had the duty to develop the record regarding whether he sought low-cost insurance, *see Scheck,* 357 F.3d at 702, the ALJ may presume that, had there been evidence that Buchholtz sought low-cost options, counsel for Buchholtz would have submitted it, *see Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir.1987) (ALJ entitled to presume that counseled claimant is making his strongest case). *See also* 20 C.F.R. 416.912(c); *Flener ex. rel. Flener v. Barnhart,* 361 F.3d 442, 448 (7th Cir.2004) (although ALJ has duty to develop record, primary responsibility rests with claimant); *Musgrave v. Sullivan,* 966 F.2d 1371, 1377 (10th Cir.1992) (ALJ must fully develop record but is not claimant's lawyer). Furthermore, Buchholtz does not have a valid excuse for failing to engage in regular physical exercise, which Dr. Thomas, knowing about Buchholtz's complaints of pain, repeatedly recommended.

Finally, although, as Buchholtz notes, the ALJ's description of his activities as a "full range" may be a stretch, *see Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000), overall Buchholtz's arguments do not overcome this court's deference to the ALJ's credibility determination, specifically its subjective observations. *Herron,* 19 F.3d at 335. The ALJ noted that throughout the hearing Buchholtz did not appear to be in great distress. And although this court has expressed discomfort with the "sit and squirm" test, it has not yet shied away from the role of observation in credibility determinations. *Powers,* 207 F.3d at, 436. Given the ALJ's subjective determination and his heavy reliance on his mostly correct analysis of Buchholtz's course of treatment, we do not find the ALJ's credibility determination to be patently wrong.

■ Having settled the credibility question, we now turn to Buchholz's three arguments concerning the ALJ's analysis at Step 5. Buchholtz first contends that the ALJ ignored the mandate of SSR 00–4p that he question the VE about inconsistencies between the VE's testimony and the Dictionary of Occupational Titles (DOT). According to Buchholtz, the DOT classifies the three jobs the VE said he could perform as requiring medium or light exertion, not as sedentary.

Although the ALJ has a duty to question a VE about any inconsistencies with the DOT and resolve that conflict before relying on the VE's testimony, SSR 00–4p at 4, counsel has the responsibility for raising the issue if the ALJ does not. *Donahue v. Barnhart,* 279 F.3d 441, 446–47 (7th Cir. 2002). In this case Buchholtz's assertion that his counsel raised the inconsistency in his cross-examination of the VE is too generous a characterization. Counsel first posed an alternate hypothetical. Then, leading into his question about Buchholtz's functionality being below the sedentary definition, he asked, "These jobs that you've indicated are at the sedentary level, right, exertional level?" Without citing specific examples of job titles, the VE responded that they were, but counsel never followed up by mentioning the DOT in his continued cross-examination or later during the hearing, nor did counsel ever suggest that the VE's testimony conflicted with any other classifications of these jobs. Hence, Buchholtz waived the issue. *See*

*Barrett v. Barnhart,* 355 F.3d 1065, 1067 (7th Cir.2004).

Buchholtz's other two arguments fare no better. Buchholtz contends that the ALJ failed to include a restriction on bending in his hypothetical to the VE despite finding Buchholtz limited to occasional bending in his RFC determination. But the ALJ included a "stooping" restriction, and the agency defines stooping as bending at the waist. *See* SSR 83–14 at 2; *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003).

Buchholtz then reads more into the ruling requiring the ALJ to separately assess each of the seven strength functions, such as sitting or standing, when he argues that the ALJ should have specified the amount of time he was able to sit and stand within the specified sit/stand option. SSR 96–8p requires separate assessments of each strength but recognizes that a final assessment may ultimately consider these activities in combination, e.g., a sit/stand option. SSR 96–8p at 5. The ALJ adhered to this ruling when adopting for its RFC determination the testimony of Dr. Mulhausen, who specified that Buchholtz was capable of standing or walking for two hours and sitting for six hours and added a sit/stand option every twenty to twenty-five minutes. As the Commissioner points out, nothing in SSR 96–8p required the ALJ to provide a more specific RFC. *Cf. Dixon,* 270 F.3d at 1175, 1178–79 (upholding disability determination even though ALJ's RFC did not specify time period for sit/stand option or discuss how need for frequent bathroom breaks would affect work ability).

Buchholtz contends, however, that the undefined sit/stand option may in essence convert a "sedentary" job into "light" work by exceeding the two-hour standing limitation or result in more than occasional bending because Buchholtz would have to perform sedentary work while standing. When a claimant's RFC does not coincide with the definition of sedentary work, he is not automatically disabled. SSR 96–9p at 34481; SSR 83–12 at 2; *Books v. Chater,* 91 F.3d 972, 980–81 (7th Cir.1996). Instead an ALJ should take into account this erosion of the occupational basis, which is what the ALJ did here by having a VE testify to the possible jobs for an individual restricted to alternating between sitting and standing every twenty to twenty-five minutes and only occasionally stooping (bending). *See* SSR 83–12 at 2, 4; *Peterson v. Chater,* 96 F.3d 1015, 1016–17 (7th Cir.1996). As such, the ALJ's analysis at Step 5 sufficiently adhered to agency requirements.

AFFIRMED.