Vicki L. HILMES, Plaintiff–Appellant,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.

No. 03–4262.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 4, 2004.

Decided Aug. 24, 2004.

Gary J. Szczeblewski, Sesser, IL, for Plaintiff–Appellant.

Mara S. Miskin, Social Security Administration, Office of the General Counsel, Chicago, IL, for Defendant–Appellee.

Before FLAUM, Chief Judge, BAUER, and SYKES, Circuit Judges.

ORDER

Vicki L. Hilmes applied for Disability Insurance Benefits in May 1998, claiming that she was disabled due to a back injury. Hilmes' claim was denied initially, upon reconsideration, and after a hearing before an administrative law judge. The Appeals Council then declined review, making the ALJ's decision the final decision of the

Commissioner of Social Security. The district court affirmed, and Hilmes appeals.

The following facts are taken from Hilmes' disability application, medical records, and testimony at the hearing. Hilmes, who was 47 years old at the time of the hearing and has a high school diploma, previously performed light work as a cashier at a fast food restaurant and sedentary work as a customer service representative before securing other light work as a dietary aide. While working as a dietary aide, Hilmes developed a herniated disc in February 1994 when placing a pan onto a cart. Hilmes underwent a lumbar discectomy at the L–5–S1 vertebrae a month later and returned to work. About a year and a half later Hilmes slipped on some water at work and reinjured her back. By September 1996 the pain from her back injuries prevented her from working at all.

Following the second accident, Hilmes embarked on a series of treatments with several doctors in an effort to alleviate her back pain. Hilmes described the pain to her doctors as a constant, shooting pain that radiated down her buttocks, hips, and legs, and reported "continued back spasms." After several MRIs, including the most recent one in February 1999, revealed scar tissue around the L5 vertebrae and crowding around the S1 nerve root but no evidence that surgery could improve Hilmes' condition, her doctors focused on pain management.

Hilmes' back surgeon, Dr. Smith, referred her in October 1995 to a pain management program, where she underwent biofeedback training, physical therapy, and injections, and also learned relaxation methods. Her doctor at the program, Dr. Richardson, also prescribed various medications including an anti-inflammatory, a pain reliever, a muscle relaxer, an antiseizure medication, and a sedative that is also prescribed for depression. These treatments appeared to provide Hilmes at least short-term relief. After Hilmes reached her "maximal medical improvement" and was discharged from the treatment program in February 1997, she still suffered what she described as "constant, debilitating pain" but agreed with the program director's assessment that she could perform sedentary work.

Following her discharge from the program, Hilmes continued to seek treatment for her back pain. She saw a physical therapist in February 1997 and reported that she was "doing better overall" but had "waves of paresthesias and pain that ran up and down her right upper extremity." From August 1997 to October 1998, Hilmes also saw Dr. Burrows, who increased her dosage of the antiseizure and sedative medications. In response to the treatment, Hilmes told Dr. Burrows at a follow-up appointment in October 1997 that she "fe[lt] much better" and that "she ha[d] a life again and [wa]s able to do many things and fe[lt] much more energy." In July and August 1998, shortly after she had filed her claim for benefits, two doctors evaluated Hilmes at the request of the Illinois Disability Determination Agency and found her capable of performing light work.

Throughout 1998 and 1999, doctors continued to increase the dosage of her medication and prescribe different kinds of drugs in an effort to alleviate her pain. One doctor, Dr. Burger, discussed possibly starting Hilmes on a course of "chronic narcotic usage," should an increased dosage of her sedative medication not alleviate her pain. The record, however, does not suggest that any doctor ultimately recommended or prescribed Hilmes narcotics. As a result of the medicine and her reported inability to exercise, Hilmes gained 100 pounds during the three-year period of

1995 to 1998. Although her doctors noted her weight gain, none of them mentioned the effect of her weight gain on her functionality. And they continued to describe her gait as normal.

Around that May 1999, Dr. Smith referred Hilmes to a Dr. Henderson. At an appointment with Dr. Henderson in May 1999, the doctor observed that Hilmes exhibited "a marked degree of pain behavior throughout the exam" and "numerous positive Waddell's signs including axial loading, skin pinch, and hip rotation." Waddell signs are manifestations of pain resulting from specific maneuvers that should not induce back pain, and are used to identify patients reacting to "psychosocial" factors, such as economics or social issues, including pending litigation. *See* Robert L. Bratton, M.D., *Assessment and Management of Acute Low Back Pain*, 60 AMERICAN FAMILY PHYSICIAN 2299–308 (November 15, 1999) *available at* www.aafp.org/afp/991115ap/2299.html; *Signs Suggestive of Nonorganic Back Pain*, *available* *at* www.neuroland.com/spine/lbp_nonorganic_sign.htm. Dr. Henderson concluded that Hilmes suffered from "chronic neuropathic pain with marked behavioral overlay," which, taken together with Hilmes' exhibiting of Waddell signs, seemed to refer to nonorganic sources for her pain.

At the hearing, Hilmes testified about the intensity of her pain, assessing it at a level of 8 to 9 out of 10. According to Hilmes, she was limited to folding laundry, driving, occasionally dusting and shopping for groceries, and watching television. On bad days, which could string together for stretches lasting up to two weeks, Hilmes had to lie down for 80 percent of the time. When assessing her physical abilities, Hilmes stated that she could lift at most 5 to 7 pounds, stand for 5 to 10 minutes, and sit for 5 to 10 minutes.

Following the five sequential steps laid out in 20 C.F.R. § 404.1520(a)-(f), the ALJ found that (1) Hilmes had not been engaged in substantial work; (2) her back injury was a severe impairment; (3) but the injury did not qualify as a listed impairment. Determining at step 4 that Hilmes could still perform the sedentary work of her past job as a customer service representative, the ALJ did not reach step 5 of the analysis and denied her application. The ALJ based his decision substantially on his determination that Hilmes was not credible because he found her subjective complaints of pain to be exaggerated. In reaching this conclusion, the ALJ relied upon the lack of medical evidence in the record to support the reported "frequency and intensity" of her pain. He also identified Dr. Henderson's diagnosis that Hilmes showed marked "behavioral overlay" as a factor he considered and that her doctors had not recommended further surgery. Although the ALJ did not further elaborate on his reasons for finding Hilmes' complaints of pain exaggerated in the paragraph discussing credibility, he emphasized in his discussion of the facts evidence supportive of his adverse credibility determination.

We will uphold the ALJ's decision so long as it is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003). Substantial evidence means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gudgel*, 345 F.3d at 470 (internal quotations and citation omitted). An ALJ must articulate, at least minimally, his analysis of the evidence so that we may follow his reasoning. *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.2002).

█ On appeal Hilmes first argues that the ALJ failed to consider the effect of her weight gain on her other impairments

as directed by Social Security Ruling 00–3p (superceded by SSR 02–1p on Sept. 12, 2002). Although the Social Security Administration removed obesity from the listing of impairments in August 1999, SSR 00–3p and subsequently 02–1p still permit an ALJ to equate obesity—alone or with other impairments—with a listed impairment, e.g., a musculoskeletal impairment, when a claimant is unable to ambulate effectively. SSR 02–1p at 5; SSR 00–3p at 5; see 20 C.F.R § 404, Subpt. P, App. 1, 1.00B(2)(b) (defining function level for musculoskeletal impairments). Hilmes did not claim obesity as one of her impairments, but she contends that the ALJ was obligated to discuss it because the record, which reveals that Hilmes gained 100 pounds in the three years preceding her disability claim, should have alerted the ALJ to the disabling effect of her weight on her back condition, see Clifford v. Apfel, 227 F.3d 863, 873 (7th Cir.2000) (even if claimant does not identify obesity as an impairment, ALJ obligated to consider excessive weight if record should have alerted ALJ that weight might be a contributing factor with respect to claimed impairment).

In this case, however, Hilmes points to no evidence demonstrating that her obesity, either alone or in combination with her back injury, has compromised her ability to ambulate. Although in her brief Hilmes calculates her Body Mass Index to prove that the ALJ should have recognized that she is obese, she misunderstands the agency's purpose in removing obesity as a listed impairment. Weight gain alone does not evidence impaired functionality; that is why SSR 00–3p and 02–1p direct an ALJ to evaluate the effect of a claimant's obesity with reference to a listed impairment and not to make assumptions about the severity or functional effects of obesity. SSR 02–1p at 1 & 6; SSR 00–3p at 6. In this case, as the ALJ notes, Hilmes gained

100 pounds in three years. But, unlike other cases where the courts have chastised an ALJ for failing to account for the effects of obesity, cf. Celaya v. Halter, 332 F.3d 1177, 1181–82 (9th Cir.2003) (ALJ erred in ignoring potential effect of obesity on related conditions of diabetes and hypertension); Clifford, 227 F.3d at 873, nowhere in the record does any doctor or even Hilmes suggest that her obesity has aggravated her back injury or inhibited her ability to ambulate. Rather, at best the record evidences that Hilmes gained weight due to her injury and side effects from the medication, and that a doctor had earlier counseled her in 1995 to lose weight. Indeed, the record repeatedly confirms that, even as Hilmes gained weight, doctors observed her gait to be "normal," and as of 1997 she was still conceding that she could perform sedentary work. Further, the ALJ was entitled to presume that, had there been evidence that her obesity affected her functionality, counsel for Hilmes would have presented it. See Glenn v. Sec'y of Health & Human Servs., 814 F.2d 387, 391 (7th Cir.1987) (ALJ entitled to presume that counseled claimant is making his strongest case); see also 20 C.F.R. 416.912(c); Flener ex. rel. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir.2004) (although ALJ has duty to develop record, primary responsibility rests with claimant); Musgrave v. Sullivan, 966 F.2d 1371, 1377 (10th Cir.1992) (ALJ must fully develop record but is not claimant's lawyer). Without evidence in the record that would have alerted the ALJ to any debilitating effects of Hilmes' weight gain, the ALJ's failure to discuss its impact is not error.

■ Turning to Hilmes' next argument, she contends that the ALJ's credibility determination is flawed because the medical evidence does not support his conclusion that Hilmes' complaints of pain were

exaggerated.[1] As a threshold matter, the Commissioner argues that Hilmes waived this argument because she raised this specific contention for the first time in the district court when she filed her objections to the magistrate's recommendation to affirm the ALJ's decision. *See Dixon v. Massanari*, 270 F.3d 1171, 1179 (7th Cir. 2001). The government is correct that Hilmes belatedly raised this credibility argument. But the district court addressed the argument on the merits, so we will do so as well.

Because the ALJ is best positioned to evaluate the credibility of a witness, we will reverse an ALJ's credibility finding only if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000) (internal quotations and citation omitted). But when questioning an applicant's credibility as to symptoms of pain, the ALJ still must follow specific requirements set forth in SSR 96–7p. First, the ALJ decides whether the pain is substantiated by medical evidence. *See* SSR 96–7p at 2; *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994). If the testimony about pain is not corroborated by objective medical evidence, then the ALJ evaluates the effects of the reported pain on the individual's functional ability to work, taking into account the claimant's daily activities; his past work history and efforts to work; the dosage, effectiveness, and side effects of medication; the nature and intensity of the reported pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment. SSR 96–7p at 3, 5; *see Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir.2004); *Luna*, 22 F.3d at 691. Discrepancies between the medical evidence and complaints of pain may reflect exaggerated claims of pain. *See Powers*, 207 F.3d at 435–36.

Hilmes argues that the ALJ did not support his credibility determination with any citations to the record other than his identification of Dr. Henderson's diagnosis of "behavioral overlay." But, although the ALJ could have cited to more evidence from the record in the paragraph specifically discussing Hilmes' credibility, his listed reasons—lack of support for the intensity and frequency of her pain, the diagnosis of behavioral overlay, and absence of further surgery—in addition to his emphasis earlier in his decision on facts relevant to credibility allow us to adequately review his conclusions. *See Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir.2003); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000) ("[W]e give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it.") (internal quotations and citation omitted).

Hilmes additionally challenges the ALJ's conclusion that her medical evidence concerning the frequency and intensity of her pain does not support her subjective complaints; Hilmes cites places in the medical evidence that allegedly shore up her subjective complaints. But her citations, when considered with the record as a whole, do not establish that the ALJ's conclusion is patently wrong. Instead, the record establishes that Hilmes testified to

---

1. Hilmes contends in her reply brief on appeal that the ALJ failed to give effect to SSR 00–3p in reaching his credibility determination, but the argument is waived, *see Luellen v. City of East Chicago*, 350 F.3d 604, 612 n. 4 (7th Cir.2003), and, in any event, our discussion about her obesity essentially resolves this contention.

a higher level of pain and lower level of functionality than she reported to her doctors. While Hilmes testified at the hearing that her pain level was constantly 8 to 9 out of 10, during her time at the pain clinic she assessed her pain as ranging from level 2 to 9, with an average level of 6 out of 10. And throughout her treatment, Hilmes reported at times to her doctors improvements in her levels of pain based on various treatments, such as her comment to Dr. Burrows in October 1997 that her pain was "overall much improved" and that she "has a life again." Moreover, she testified at the hearing to very limited physical capabilities, yet as late as October 1998—five months after she filed her claim for benefits—Hilmes was pulling 30 pounds of books on a cart twice a week to school.

Finally, Hilmes argues that the ALJ's credibility determination is flawed because the ALJ took out of context Dr. Henderson's statement that Hilmes showed marked "behavioral overlay." According to Hilmes, "a marked behavioral overlay" means only that Hilmes exhibited "visible signs of pain throughout the exam from her body, facial expressions and her behavior due to pain she was experiencing from her Chronic Nueropathic [sic] Pain," and not that she exaggerated her pain. But Hilmes provides no citation for this definition of "behavioral overlay," and there is no evidence that the ALJ misunderstood Dr. Henderson's use of the term. In diagnosing Hilmes as showing evidence of behavioral overlay, Dr. Henderson noted that Hilmes had exhibited several Waddell signs, which fit with the understanding the ALJ gave to "behavioral overlay"—manifestations of pain that do not have an organic origin. *See* Bratton, *supra.* But the ALJ's assumption that Hilmes' behavioral overlay necessarily means that she exaggerated her symptoms is where the ALJ runs into trouble. Malingering is not the only conclusion to be drawn from the exhibiting of Waddell signs. *See* Chris Main, Ph.D., and Gordon Waddell, D.Sc., M.D., *Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs,"* 23 Spine 2367–2371 (November 1998) (abstract) (behavioral signs alone not a test of credibility or malingering); *Screening for Psychological Factors in Patients with Low Back Problems: Waddell's Nonorganic Signs,* available at /www.orthotee rs.co.uk/Nru-jpīj33lm/Orthspinelbp2.htm, *adapted from* D.A. Scalzitti, *Screening for Psychological Factors in Patients with Low Back Problems: Waddell's Nonorganic Signs,* 77 PHYSICAL THERAPY 306–312 (1997). The reactions may stem from economic or social factors or even pending litigation, but they may also be traced to a psychological source, which this court has held to be no less disabling, *see Carradine v. Barnhart,* 360 F.3d 751, 755–56 (7th Cir.2004). *See* D.A. Scalzitti, *supra.* But Hilmes never argues this point. And the ALJ's failure to discuss this possibility does not mean that his credibility determination is "patently wrong"; the Waddell signs, when considered with the inconsistencies between Hilmes' testimony and her medical records, sufficiently support his inference that she was exaggerating.

AFFIRMED.